Exh. B

LEXSEE 1998 US DIST LEXIS 21631

**SHEIKH BASHIR AHMED, M.D., Plaintiff v. BERKSHIRE MEDICAL CENTER, INC., Defendant**

CIVIL ACTION NO. 94-30250-FHF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

1998 U.S. Dist. LEXIS 21631

March 31, 1998, Decided

**DISPOSITION:** [*1] Defendant's motion for summary judgment GRANTED. Plaintiff's cross-motion for summary judgment DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For SHEIKH BASHIR AHMED, Plaintiff: Sheikh Bashir Ahmed, Bolling Brook, IL.

For BERKSHIRE MEDICAL CENTER, INC., Defendant: John F. Rogers, Cain, Hibbard, Myers & Cook, Pittsfield, MA.

For BERKSHIRE MEDICAL CENTER, INC., Defendant: Kevin M. Kinne, Cain, Hibbard, Myers & Cook, Great Barrington, MA.

**JUDGES:** Frank H. Freedman, Senior United States District Judge.

**OPINIONBY:** Frank H. Freedman

**OPINION:**

MEMORANDUM AND ORDER

March 31, 1998

FREEDMAN, S.J.

I. INTRODUCTION

Plaintiff Sheikh Bashir Ahmed, M.D. ("plaintiff"), brought this action against defendant Berkshire Medical Center, Inc. ("defendant"), alleging that defendant wrongfully terminated him from its residency program, and seeking relief under various federal statutes and common law tort theories. Defendant now moves for summary judgment and asserts that there are no genuine issues of material fact. Plaintiff opposes this motion and cross moves for summary judgment. Defendant opposes plaintiff's cross motion for summary judgment.

II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) declares that summary [*2] judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and a fact is "material" if it is one which "might affect the outcome of the suit under the governing law." See Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993), cert. denied, 511 U.S. 1126, 128 L. Ed. 2d 863, 114 S. Ct. 2133 (1994). Cross motions for summary judgment do not alter the basic Rule 56 standard, but require a determination of whether either party deserves judgment as a matter of law based on facts that are not disputed. See Wightman v. Springfield Terminal Ry., 100 F.3d 228, 230 (1st Cir. 1996); see also Wiley v. American Greetings Corp., 762 F.2d 139, 141 (1st Cir. 1985). As such, cross motions simply demand that all factual disputes and any competing rational inferences be resolved in the light most favorable to the party [*3] opposing summary judgment. See Den Norske Bank v. First Nat'l Bank of Boston, 75 F.3d 49, 53 (1st Cir. 1996). In employment discrimination cases, summary judgment may be appropriate if the nonmoving party

relies "upon conclusory allegations, improbable inferences, and unsupported speculation" as to any essential element of his claim. Byrd v. Ronayne, 61 F.3d 1026, 1030 (1st Cir. 1995) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

Because plaintiff is proceeding pro se, the Court interprets his complaint liberally. See Ayala Serrano v. Lebron Gonzalez, 909 F.2d 8, 12 (1st Cir. 1990).

III. FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed a complaint on or about October 27, 1994, seeking relief after he was terminated from his medical residency position at Berkshire Medical Center. Briefly, the case history is as follows: Plaintiff was raised and educated in the Kashmir section of India. Ahmed Dep. at 12. He became an Indian physician in 1974. Id. at 9. By 1979 he had reached the end of the Indian medical educational path after completing a doctorate in internal medicine. Id. at 10. From 1979 to 1989 he held the position of [*4] medical school lecturer and consultant in an Indian medical School. Id. His duties at that time consisted of caring for patients and teaching medical students and junior doctors. Id. at 18.

In 1989, plaintiff decided to move to the United States as he felt he "had reached a peak . . . in the medical education in India" and he wanted to become a "specialist" in the field of cardiology. Id. at 29. However, upon reaching the United States, plaintiff needed to undergo three years of residency training in internal medicine in order to become certified in internal medicine by the American Board of Internal Medicine (the "ABIM"). Id. at 50-54. Certification by the ABIM is a necessary prerequisite for a cardiology fellowship. Id.

Based on his education and training in India, plaintiff sought to "short track" his internal medicine residency and reduce his ABIM certification requirement from three years to two years. Id. at 44-45. Therefore, he tried to obtain a residency position in a teaching hospital program which would hire him at the second year resident ("PGY-2") level instead of the first year resident ("PGY-1") level. Id. at 41.

Despite these intentions, [*5] plaintiff could not find a program that would hire him immediately as a PGY-2. Id. at 47. Therefore, he had to begin his medical career in the United States as a PGY-1. Id. Plaintiff felt that this status was demeaning because he "had to work under a second and third year resident who was much less experienced and much less educated in terms of the knowledge of medicine . . . ." Id. at 50-51. He found it "difficult" to "take instructions from a person who would not be as educated, not as experienced and probably not as clinically skilled as [he] was." Id. at 52.

In the summer of 1990, plaintiff began a residency program at Michael Reese Hospital ("Michael Reese") in Chicago, Illinois. Id. at 44. On March 6, 1991, he was charged with sexually harassing two other employees at Michael Reese. Id. at 93-94. Plaintiff was eventually terminated from the Michael Reese residency program on March 12, 1991. Id. at 96.

Michael Reese was required to complete a yearly official evaluation form, the "Residents Annual Evaluation Summary," of each resident participating in its program and submit the evaluation to the ABIM. Id. at 99-101. On or about June 11, 1991, [*6] John P. Quinn, M.D. ("Dr. Quinn"), completed the evaluation form on behalf of the Michael Reese program and described plaintiff's "performance and status" as "unsatisfactory and terminated from the program." Id. at 104, Ahmed Dep. Ex. 2. The Michael Reese evaluation also indicated that plaintiff had demonstrated weaknesses in the following areas: "(a) professional attitudes and behavior toward patients and other health care professionals; (b) medical care; (c) moral and ethical behavior; and (d) impairment - psychiatric." Id. Finally, the evaluation form summarized plaintiff's situation as follows:

> Dr. Ahmed has been terminated from the Program for psychiatric reasons. Dr. Ahmed displayed carelessness in caring for patients. He exhibited a severe personality disorder which prevented him from working successfully with others. He refused all attempts at remediation, including a strong recommendation that he seek psychiatric care. While on probation from the Program, he was accused of sexual harassment.

Id. Despite the fact that the Michael Reese Evaluation was dated June 11, 1991, the document was not submitted to the ABIM until sometime after the fall of [*7] 1991. Ahmed Dep. at 137.

However, in April of 1991, Michael Reese's Residency Program Director, W.H. Chamberlain, M.D. ("Dr. Chamberlain"), provided plaintiff with a "reference letter" for him to show prospective employers. Id. Dr. Chamberlain's letter indicated that plaintiff had completed eight months of an internal residency at Michael Reese as a PGY-1, and that the time could be held as partial completion of the ABIM certification requirements. Id. In July of 1991, plaintiff contacted James R. McCormick, M.D. ("Dr. McCormick"), defendant's Residency Program Director in Internal Medicine, about whether there were any openings in Berkshire Medical Center's Residency Program. Id. at

134, Aff. of James R. McCormick, M.D. ("McCormick Aff.") P 3. Dr. McCormick thereafter interviewed plaintiff for a PGY-2 position and offered him the position contingent upon his satisfactory completion of each residency rotation and verification that plaintiff had previously satisfactorily completed his PGY-1 year. Ahmed Dep. at 140-41, McCormick Aff. P 4. Dr. McCormick then called Dr. Chamberlain, who limited his comments to only confirm that plaintiff had completed eight months in Michael [*8] Reese's Residency Program. Ahmed Dep. at 140, McCormick Aff. P 5.

Plaintiff began to work for defendant, as a second year medical resident in July of 1991. Ahmed Dep. at 149, 156, McCormick Aff. P 7. The terms and conditions of his employment were governed by a Graduate Medical Education Agreement (the "Agreement"), which he executed on July 16, 1991. Id. at 144-45, Ahmed Dep. Ex. 3. Pursuant to the Agreement, plaintiff's continued employment was contingent on his performance "in a competent, efficient and satisfactory and courteous manner." Ahmed Dep. Ex. 3. The Agreement also provided that defendant "reserves the right to terminate this contract . . . or to take other appropriate action, including temporary suspension or termination, if [a resident] violates the terms of this Agreement or if his performance is unsatisfactory . . . . If circumstances permit, the housestaff member will be given seven (7) days advance notice of termination in writing." Id. Finally, the Agreement provided that it was a resident's duty to "comply with applicable personnel policies or professional staff rules at the hospital . . . ." Id.

During the first couple of months of his PGY-2 assignment [*9] at Berkshire Medical Center, plaintiff performed satisfactorily. McCormick Aff. at P 7. In or about the fall of 1991, Dr. McCormick started to become increasingly concerned about plaintiff's poor attitude and bad behavior towards both patients and staff at the hospital. McCormick Aff. P 7. Dr. McCormick believed that plaintiff was having trouble adjusting to the role of a resident and taking direction from physicians with less years of experience than he had received in India. McCormick Aff. P 8. Dr. McCormick personally found that plaintiff was unable or unwilling to acknowledge error, or to accept either constructive criticism or the guidance of more experienced physicians whose role it was to oversee his performance. McCormick Aff. P 9. Beginning in October of 1991, numerous other physicians at Berkshire Medical Center started complaining to Dr. McCormick in his role as Residency Program Director about plaintiff's performance and his inability to work effectively with physicians and staff. McCormick Aff. P 11; Mem. to file 11/4/91 (Ex. A); Letter from Stuart J. Masters, M.D. 10/15/91 (Ex. B); Letter from Henry J. Rose, M.D. 11/1/91 (Ex. C); Letter from Philip Adamo, M.D. 11/18/91 [*10] (Ex. D); Letter from John F. Burnham, M.D. 12/1/91 (Ex. E); Letter from Jack K. Ringler, M.D. 12/2/91 (Ex. F); and Letter from Robert M. Roth, M.D. 12/4/91 (Ex. G).

In light of the volume of criticism over a relatively short time period, Dr. McCormick met with plaintiff on December 5, 1991. McCormick Aff. P 14. Dr. McCormick reviewed with plaintiff the complaints and concerns about plaintiff's attitude and performance. Id. P 15. Plaintiff refused to admit any possibility of shortcomings on his part or a desire to improve his attitude or performance. Id. Plaintiff, "denied that each problem had occurred, expressed his opinion that the attending physicians and residents were wrong or that he was the object of a conspiracy controlled by individuals at Michael Reese Hospital." Id., Mem. File to File 12/5/91 (Ex. H).

By the end of the meeting, Dr. McCormick decided that he would have to terminate plaintiff from the residency program because of lingering concerns about plaintiff's medical judgment and his inability or unwillingness to accept criticism, correction or advice from his superior doctors. McCormick Aff. P 16. Therefore, before ending his meeting with plaintiff, Dr. [*11] McCormick advised him that he would not be offered a contract for a third year of residency and that he would be asked to leave Berkshire Medical Center. McCormick Aff. P 18. Dr. McCormick also removed plaintiff from some of his medical responsibilities. Id. After orally notifying plaintiff that he would be terminated, Dr. McCormick continued to receive information that further confirmed his concerns about plaintiff. McCormick Aff. P 19; Letter from Robert M. Roth, M.D. 12/9/91 (Ex. I); Letter from Daniel S. Kusick, M.D. 12/10/91 (Ex. J); Letter from David R. Finck, M.D. 12/31/91 (Ex. K).

By letter dated January 2, 1992, Dr. McCormick formally advised plaintiff that his "performance as a senior resident supervising others . . . has not been satisfactory" and his "recent rotation in the Cardiac Care Unit has been rated unsatisfactory." McCormick Aff. P 20. He also referenced the various difficulties that others had experience in working with Plaintiff. Id. Plaintiff was informed that his employment would be terminated on March 1, 1992. Id., Letter from James R. McCormick, M.D. to S. Bashir Ahmed, M.D. 1/2/92 (Ex. L).

After receiving formal written notification of Dr. McCormick's [*12] termination decision, plaintiff appealed the decision pursuant to the Residency Programs Personnel Policies. McCormick Aff. P 23. Dr. McCormick observed Step One of the appeals process and denied plaintiff's request for withdrawal of the

Case 1:04-cv-11663-RCL    Document 8-3    Filed 09/09/2004    Page 5 of 11

Page 4
1998 U.S. Dist. LEXIS 21631, *

dismissal. Id. Plaintiff then pressed his appeal to Step Two. Ahmed Dep. at 197. As a result, an *ad hoc* physicians committee (the "Committee") was formed to review the termination decision. Id. The Committee was comprised of five doctors, none of whom had written any letters against plaintiff. Id. On January 24, 1992, the Committee conducted a hearing at which plaintiff spoke and addressed the allegations against him. Id. at 197-98. Despite plaintiff's arguments, the Committee voted unanimously to uphold his dismissal. Id. at 200-01.

In reaching Step Three of the appeals process, the Director of Medical Education/Academic Dean, Henry Tulgan, M.D. ("Dr. Tulgan") also supported Dr. McCormick's termination decision. Id. at 201. Dr. Tulgan notified plaintiff of his decision by letter on January 27, 1992. Id., Aff. of Dr. Henry Tulgan ("Tulgan Aff."), P 5, 6. On January 28, 1992, plaintiff invoked Step Four, the final appeal [*13] procedure. Tulgan Aff. P 6.

Plaintiff requested that Helen Downey, R.N., be chosen to chair the five-member Medical Center Hearing Board (the "Board"), which was responsible for rendering a final, binding ruling as to whether Dr. McCormick's termination decision should be upheld. Id. P 7. Dr. McCormick had no objection and Ms. Downey was selected as Board chair. Id. P 8. Plaintiff then selected two members of the Board and Dr. McCormick selected the remaining two members. Id. The Board met several times to consider all of the information submitted by plaintiff and Dr. McCormick. After hearing from plaintiff and reviewing the material he submitted, the Board voted unanimously to uphold Dr. McCormick's discharge decision. Id. P 9. On March 20, 1992, Dr. Tulgan formally notified plaintiff that his discharge had been upheld and that his termination was retroactive to March 1, 1992. Id. P 10. Letter from Henry Tulgan, M.D. to S. Bashir Ahmed, M.D. 3/20/92 (Ex. A).

Following the decision to terminate plaintiff, Berkshire Medical Center did not fill his PGY-2 slot for the remainder of the academic year. McCormick Aff. at P 22. In addition to plaintiff, there were seven [*14] other PGY-2 medical residents during the 1991-92 academic year. Id. Of these seven individuals, two were of Indian national origin, one was of Pakistani origin, one was of Bolivian national origin and three were born in the United States. Id. In the same year that plaintiff was discharged, defendant hired sixteen new medical residents, three of whom were of Indian national origin. Id.

In his four-count complaint, plaintiff alleges generally that defendant: (1) discriminated against him on the basis of his natural origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 1985(3) (Count One); (2) denied him of property without due process of law (Count Two); (3) breached his employment contract (Count Three); and (4) intentionally and/or negligently inflicted emotional distress upon, and caused harm to, his professional reputation (Count Four). On January 27, 1995, defendant filed an answer and a motion to dismiss. On February 16, 1995, this Court dismissed the portion of Count Two which relied on jurisdictional statutes and the portion of Count Four as it applies to intentional or negligent emotional distress. [*15] See Ahmed v. Berkshire Medical Center, Inc., 1995 U.S. Dist. LEXIS 22082, C.A. No. 94-30250-FHP, Memorandum and Order (D. Mass. Feb. 16, 1995). The Court left the portion of Count Four which asserted a defamation claim for further proceedings. Id.

IV. DISCUSSION

Defendant asserts that summary judgment should be granted as a matter of law on all of plaintiff's claims because no genuine issue of material fact exists regarding plaintiff's unsatisfactory employment history and his proper termination for poor performance and insubordination. Plaintiff opposes defendant's summary judgment motion, and cross moves asserting that summary judgment should be entered in his favor on all claims.

A. National Origin Discrimination

Plaintiff claims that defendant discriminated against him by terminating his employment based on his national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981. Both Title VII and section 1981 prohibit purposeful discrimination on the basis of national origin, n1 and are subject to the same legal analysis. See Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 97 (1st Cir. 1996). Under each statute [*16] a plaintiff bears the burden of proving that he was the victim of intentional discrimination either through direct evidence of discrimination or through facts which support an inference of discrimination. Id. at 95-96. When, as here, the plaintiff produces no direct evidence of discriminatory animus, the Court proceeds under the three-stage burden-shifting formula pronounced by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See id. at 802-04; see also Patterson v. McLean Credit Union, 491 U.S. 164, 186, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989) ("[McDonnell Douglas] scheme of proof . . . should apply to claims of racial discrimination under § 1981."). That framework is designed to allocate burdens of production and order the presentation of evidence so as to "progressively sharpen the inquiry into the elusive factual question of intentional discrimination." Texas

Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 n.8, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).

n1 Title VII of the Civil Rights Act of 1964 provides, in relevant part:

> It shall be an unlawful employment practice for an employer--
>
> (1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin . . .; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . national origin . . . .

42 U.S.C. § 2000e-2(a).

Similarly, 42 U.S.C. § 1981, as amended, reads as follows:

> (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

[*17]

1. The Prima Facie Case

Under the three-step McDonnell Douglas framework, a plaintiff must first establish a prima facie case of national origin discrimination. A prima facie case of national origin discrimination in employment is established by showing: (1) plaintiff is a member of a protected class; (2) plaintiff possessed the necessary qualifications and adequately performed his job; (3) plaintiff was nevertheless dismissed by his employer; and (4) plaintiff's position remained open and was eventually filled by someone with the same qualifications and not within the protected class. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 505-07, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993), Worlds v. Thermal Industries, Inc.; 928 F. Supp. 115, 119 (D. Mass. 1996).

The plaintiff in this case effortlessly establishes the first and third elements of the prima facie case, that is, he is a member of a protected class by virtue of his Indian (Kasmir) national origin and he was terminated from defendant's residency program. However, with respect to the second and third elements, his task is not so perfunctorily met.

As to the second element, plaintiff must show that he met his [*18] employer's legitimate job performance expectations. Here, plaintiff has submitted no evidence other than his barefaced assertions that he made absolutely no errors, whether they be major or minor, during his employment at the hospital. While recognizing that at this stage "the required prima facie showing is not especially burdensome," Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995), nevertheless, the Court finds that plaintiff has not submitted even minimal evidence to meet his slight evidentiary burden. Moreover, in respect to the third claim, the undisputed evidence establishes that plaintiff's residency position remained unfilled for the remainder of the 1991-92 academic year. Additionally, when defendant later hired sixteen new medical residents for the following year's program, three of them were of Indian national origin. Therefore, plaintiff also does not satisfy the fourth prong of his prima facie case.

Based on the two deficiencies to the prima facie case, plaintiff's claim of national origin discrimination fails. However, because plaintiff is pro se and this initial burden is minimal, the Court will address the second and third stages of the burden-shifting [*19] analysis for the sake of completeness.

2. Articulating A Nondiscriminatory Reason

If plaintiff did successfully establish a prima facie case, a presumption of national origin discrimination would arise and the burden of production would shift to defendant to rebut this initial showing by evidencing some legitimate, nondiscriminatory business reason for ultimately terminating plaintiff. See Burdine, 450 U.S. at 254; Udo v. Tomes, 54 F.3d 9, 12 (1st Cir 1995). In this case, defendant asserts that its reason for firing plaintiff was because of the increasing danger presented to both patients and junior doctors based on plaintiff's defiant work attitude when he is confronted with mistakes or criticism. As proof of this, defendant introduced a series of letters from the medical staff of the teaching hospital which document that plaintiff had increasing episodes of deleterious medical decisionmaking, a problem expected of junior residents, but hazardously compounded by plaintiff's tendency to contest the authority and medical judgment of his superiors. In addition, a general inability of plaintiff to get along with his fellow staff members of both superior and subordinate rank [*20] is noted throughout the record. Based on the evidence submitted, the Court is satisfied that defendant has amply demonstrated substantial evidence articulating its legitimate and nondiscriminatory reason for terminating plaintiff. Insubordination and belligerence as a junior resident in a teaching hospital, and failing to get along with both co-workers and supervisors in a professional setting which requires cohesive teamwork to assure quality patient care, certainly justify firing plaintiff. See Johnson v. Allyn & Bacon, Inc., 731 F.2d 64, 73 (1st Cir.) (confirming that inability to get along with co-workers amounts to legitimate non-discriminatory reason for firing employee), cert. denied, 469 U.S. 1018, 83 L. Ed. 2d 359, 105 S. Ct. 433 (1984); see also McNairn v. Sullivan, 929 F.2d 974, 978 (4th Cir. 1991) (employee was not promoted because she was caustic with other employees, made mistakes, and did not follow instructions), Burrus v. United Tel. Co., 683 F.2d 339, 343 (10th Cir.) (inability to get along with others justified termination), cert. denied, 459 U.S. 1071, 74 L. Ed. 2d 633, 103 S. Ct. 491 (1982).

3. Pretext For Discrimination

The defendant's production [*21] of a nondiscriminatory reason for discharging plaintiff defeats any presumption of discrimination that plaintiff could have created with a prima facie showing. However, for the purposes of continuing with his employment discrimination claims, plaintiff would then need to demonstrate that defendant's stated reasons for his termination were a pretext for intentional national origin discrimination. See Burdine, 450 U.S. at 254-56; Woods v. Friction Materials, Inc., 30 F.3d 255, 260 (1st Cir. 1994) (employee must prove "both that the employer's articulated reason is false, and that discrimination was the actual reason for its employment action"). Plaintiff can meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation [is] unworthy of credence." Burdine, 450 U.S. at 256 (citing McDonnell Douglas, 411 U.S. at 804-05). The evidence and all inferences that properly can be drawn from plaintiff's prima facie case may be considered in determining whether defendant's explanation is pretextual and whether national origin animus was the real reason [*22] for the termination decision. See Hicks, 509 U.S. at 511; Burdine, 450 U.S. at 256, n.10.

Here, plaintiff has simply not produced any direct or indirect evidence of an intent to discriminate. Moreover, in attempting to demonstrate that defendant's reason for firing him was pretextual, plaintiff asserts that he had the requisite medical skills, "never made any mistakes," and presumably by extension, did not need to heed the advice or criticism of the doctors supervising his performance in the teaching hospital setting. In addition, plaintiff himself does not even allege that the real reason for his termination was discriminatory. Throughout his pleadings he repeatedly states that the only reason that defendant terminated him was because of the Michael Reese ABIM evaluation, which demonstrated that he had not completed his PGY-1 training. Ahmed Dep. at 104-13. He further states that "the only thing that [defendant] did wrong" was to blame his termination on poor performance rather than the Michael Reese evaluation. Id. at 110-11.

The Court finds as a matter of law that plaintiff has failed to meet the burden of persuasion on the issue of pretext as he does not demonstrate [*23] that he was terminated for any reason other than the fact that his interpersonal skills as combined with his developing clinical skills were perceived as being dangerous to his patients and to his junior doctors. Plaintiff's employment history at Berkshire Medical Center, and his own testimony, reveal that he could not accept that he ever made any medical mistakes, major or minor, which he could learn from in the teaching setting. This type of continual defiance provided defendant with a well-documented, good faith reason to terminate him, namely his unwillingness to accept the authority of his various supervising physicians. Moreover, plaintiff has not

provided any evidence that animus due to his national origin was any part of his employer's decision-making process. His unsubstantiated allegations and interpretation of events will not suffice to establish evidence of discriminatory intent. See Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993). As there is no genuine dispute as to whether defendant's stated reason for terminating plaintiff was a pretext for discrimination, defendant is entitled to summary judgment on plaintiff's national origin discrimination [*24] claims under Title VII and 42 U.S.C. § 1981. Accordingly, the Court denies plaintiff's motion for summary judgment on this count.

B. Conspiracy under 42 U.S.C. § 1985(3)

The second part of Count One asserts that defendant conspired to deprive plaintiff of his residence and impede his future career prospects. In order to prove his claim under 42 U.S.C. § 1985(3), plaintiff must establish the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive him, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property or (b) a deprivation of a constitutionally protected right or privilege. Griffin v. Breckenridge, 403 U.S. 88, 102, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971). The First Circuit additionally requires that the plaintiff show that the conspiratorial conduct was propelled by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

In his complaint and other submissions, plaintiff generally asserts that defendant, Dr. Quinn [*25] of the Michael Reese Hospital, and ABIM engaged in a conspiracy to cause him to lose his residency and ruin his medical career. A conspiracy claim must allege specific facts that strongly suggest an agreement existed among the alleged actors to commit a wrongful act. See Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir. 1980). Along these lines, plaintiff has submitted no evidence to the Court which demonstrates such an agreement was ever formed between defendant and the named actors, nor has he even documented any instances or means of communication between defendant and the other alleged conspirators through which they may have come to such an agreement. As for defendant agreeing to partake in a concerted action harmful to his career, plaintiff himself points to the contrary when he reflects that defendant "did not have any choice. It did not have any choice except to terminate me [based on the Michael Reese ABIM evaluation]" Ahmed Dep. at 109-10. As such, plaintiff does not present any evidence that defendant concurred with any other actor to take action with the purpose of ruining his career. By failing to evidence his conspiracy claim with any degree of particularity to [*26] show agreement and concerted action on behalf of defendant, the Court finds that his claim under 42 U.S.C. § 1985(3) is insufficient to withstand summary judgment. n2

> n2 Moreover, plaintiff does not offer any proof that defendant conspired to terminate him based on his Indian national origin. As illustrated in the preceding section, defendant's pattern of hiring and retaining Indian residents before and after plaintiff initially demonstrates a lack of discriminatory animus against Indian nationals. See Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341, 349 (1st Cir. 1995).

C. Due Process Violations under 42 U.S.C. § 1983

Plaintiff claims that defendant violated 42 U.S.C. § 1983 by infringing on his rights to equal protection under the Fifth and Fourteenth Amendments and by depriving him of property without due process of law. To state a claim under section 1983 plaintiff must show: (1) the existence of a federal or statutory right and (2) a deprivation of that right by a person [*27] acting under color of state law. See Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 84 F.3d 487, 491 (1st Cir. 1996); Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 32 (1st Cir. 1996).

Under this second prong, plaintiff must demonstrate that defendant's decision to terminate him was state action, because section 1983 is irrelevant to private conduct. As an initial matter, the First Circuit, along with a number of other courts, has found that private hospitals are private entities and not state actors. See Rockwell v. Cape Cod Hosp., 26 F.3d 254, 260-61 (1st Cir. 1994); Mendez v. Belton, 739 F.2d 15, 18 (1st Cir. 1984); see also Harvey v. Harvey, 949 F.2d 1127, 1132 (11th Cir. 1992); Modaber v. Culpeper Memorial Hosp., Inc., 674 F.2d 1023, 1027 (4th Cir. 1982); Benjamin v. Aroostook Medical Center, 937 F. Supp. 957, 969 (D. Me. 1996) (private hospital not state actor even though it is subject to federal and state regulation, receives government funding and conducts peer reviews as required by state law) aff'd, 113 F.3d 1 (1st Cir.), cert. denied, 139 L. Ed. 2d 490, 118 S. Ct. 602 (1997). Consequently, the [*28] Court finds that defendant does not immediately qualify as a state actor under these requirements.

However, in order to determine whether a private entity nonetheless engaged in state action for purposes of section 1983, the First Circuit looks to the possibility of direct state action and then to any incidents of possible

indirect state action. In looking for direct state action the inquiry is whether defendant is a state agency or whether it mimics a state agency, the degree of control being the decisive factor. Here, plaintiff submits no evidence to establish that defendant is controlled or influenced by officials working for either the Commonwealth of Massachusetts or the federal government. Thus, the Court cannot label defendant a state actor under the direct control test.

As for indirect state action, the First Circuit uses three tests to determine whether a private entity's actions rise to the level of state action: the nexus test, the traditional function analysis, and the symbiotic relationship test. See Barrios-Velazquez, 84 F.3d at 492-93. Under the nexus test, plaintiff appears to rely on state and federal regulation and financing to establish a "nexus" between the [*29] government and the teaching hospital. However, courts have consistently held that neither government financing nor regulation is enough to convert private action into state action. See Blum v. Yaretsky, 457 U.S. 991, 1004, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982) (extensive regulation did not convert nursing home into state actor); Rendell-Baker v. Kohn, 457 U.S. 830, 840-41, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982) (extensive government funding and regulation did not convert private school into state actor); Rockwell, 26 F.3d at 258 ("government regulation, even extensive regulation, and the receipt of federal funds, such as Medicare, Medicaid and Hill-Burton funds, are insufficient to establish that a hospital or other entity acted under color of state law"); Mendez, 739 F.2d at 18 (same). Moreover, in this case, no governmental entity played a role in the selection, review or termination of residents from defendant's residency program. As defendant acted independently with respect to personnel decisions and in terminating plaintiff, the existence of federal funding and general governmental regulation is insufficient to qualify defendant as a state actor under the [*30] nexus test.

As to the traditional public function test, defendant would qualify as a state actor if it was found to have "assumed powers 'traditionally reserved to the State.'" Barrios-Velazquez, 84 F.3d at 493-94 (quoting Rodriques v. Furtado, 950 F.2d 805, 813 (1st Cir. 1991)). Here, state action is implied only if the government has transferred some area of its traditional responsibility to a private entity. Id. Therefore, plaintiff must prove that defendant's role in training medical residents is both a traditional government function, as well as an exclusive government function. Rodriguez-Garcia, 904 F.2d 90, 98. Here, plaintiff's claim fails on either prong because courts do not classify health care services as either an exclusive or traditional government function. See Barrios-Velazquez, 84 F.3d at 494 (promoting savings, providing loans and administering medical services is not an exclusive government function); see also McKeesport Hosp. v. Accreditation Council for Graduate Medical Educ., 24 F.3d 519, 525 (3d Cir. 1994) (evaluation and accreditation of medical facilities is not an exclusive state function).

Finally, defendant may not be considered [*31] a state actor under the symbiotic relationship test because the government has not "so far insinuated itself into a position of interdependence with [defendant] that it must be recognized as a joint participant in the challenged activity." Barrios-Velazquez, 84 F.3d at 494. As the government had no involvement in the termination process, the government in no way "insinuated" itself into the personnel process at Berkshire Medical Center such that defendant could be considered to be in a "position of interdependence" with the state. See Rodriguez-Garcia, 904 F.2d at 98. Therefore, as the Court can find no state action by defendant, plaintiff has failed to support his claim under section 1983 and to demonstrate a genuine issue of fact precluding summary judgment. n3 As a result, the Court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment on this count.

> n3 Secondary to the state action determination, the Court finds throughout the four-stage appeal of the termination decision that plaintiff received considerable due process of notice and an opportunity to be heard. See Board of Curators of the University of Mo. v. Horowitz, 435 U.S. 78, 90, 55 L. Ed. 2d 124, 98 S. Ct. 948 (1978); Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985).

[*32]

D. Breach of Contract

In Count III of his complaint plaintiff alleges that defendant "breached his contract of employment by denying him the procedural due process required by the specific provisions of his contract . . . and the rules, policies, and procedures governing the residency program . . . ." See Complaint at 45. However, pursuant to the express terms of the Graduate Medical Education Agreement ("the Agreement"), plaintiff's continued employment was contingent upon his performance "in a competent, efficient and satisfactory and courteous manner in strict accordance with the professional and ethical standards of the medical profession." Ahmed Dep. Ex. 3. The Agreement also provided that defendant "reserves the right to terminate this contract . . . or to take other appropriate action, including temporary suspension

or termination, if [plaintiff] violates the terms of this Agreement or if his performance is unsatisfactory . . . ." Id. Finally, plaintiff has demonstrated that he understood defendant could terminate his contract if his performance was found to be unsatisfactory. Ahmed Dep. at 149.

The Court finds that defendant had the right to terminate the Agreement [*33] upon a determination that plaintiff was not performing satisfactorily or that he was not acting in a respectful and courteous manner. As the undisputed evidence in this case demonstrates that defendant found plaintiff's performance and attitude to be increasingly unsatisfactory, the Court finds defendant to have properly exercised its right to terminate the Agreement. See Garrity v. United Airlines, Inc., 421 Mass. 55, 653 N.E.2d 173, 178 (Mass. 1995). As such, defendant cannot be liable for breach of the Agreement and summary judgment will enter in defendant's favor.

E. Defamation

In Count VI, plaintiff alleges that defendant defamed him when it submitted a final evaluation of his performance at the hospital to ABIM and "falsely alleged that [he] had unsatisfactorily performed at Berkshire Medical Center when [he] had always had a satisfactory or superior performance at Berkshire Medical Center." Ahmed Dep. at 206. According to plaintiff, the statements contained in defendant's ABIM Evaluation constitute the sole basis for his defamation claim. Id. at 209. Along with the darkening of ovals indicating that plaintiff performed in an "unsatisfactory" manner, the summary [*34] portion of the evaluation read:

> This resident was counseled from the beginning and adamantly refused to accept that he had a problem with interpersonal relationships. His refusal blocked our ability to teach him & impaired his growth as a clinician. After a long review process and review at several levels, including the Dean's office, he was discharged from our program.

Id.

Defendant contends that it is entitled to judgment as a matter of law because there were no false statements of fact in the evaluation submitted to ABIM, but only "nonactionable statements of opinion." Judd v. McCormack, 27 Mass. App. Ct. 167, 535 N.E.2d 1284, 1289 (Mass. App. Ct. 1989). Moreover, defendant argues that summary judgment should enter in its favor because regardless of the truth or falsity of any statement, plaintiff fails to defeat defendant's conditional privilege to make and collect allegedly defamatory comments about an employee.

Defamation is the publication, orally or in writing, of false statements of fact which discredit a person "in the minds of any considerable and respectable segment in the community." Tropeano v. Atlantic Monthly Co., 379 Mass. 745, 400 N.E.2d [*35] 847, 851 (Mass. 1980) (citing Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 330 N.E.2d 161, 165 (Mass. 1975). Nevertheless, various Massachusetts courts have held that an employer retains the right to a conditional privilege to make defamatory statements provided that they are published to a narrow group who shares a common interest in the communication. See Bratt v. International Bus. Mach. Corp., 392 Mass. 508, 467 N.E.2d 126, 129 (Mass. 1984) (memorandum sent from director of personnel to other supervisors regarding employee's mental health); Foley v. Polaroid Corp., 400 Mass. 82, 508 N.E.2d 72, 80 (Mass. 1987) (statements made by employer's executives to other executives and an employee representative); Goldhor v. Hampshire College, 25 Mass. App. Ct. 716, 521 N.E.2d 1381, 1386 (Mass. App. Ct. 1988) (college president's statement to trustees and a benefactor concerning reasons for plaintiff's suspension). Moreover, "an employer has a conditional privilege to disclose defamatory information involving an employee when the publication is 'reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job.'" [*36] Foley, 508 N.E.2d at 79 (quoting Bratt, 467 N.E.2d at 129). Once an employer's conditional privilege exists, the burden shifts to the employee to prove that the privilege was abused. Id. To defeat the privilege, the employee must show that the statements were made with knowledge of their falsity, reckless disregard for the truth, or actual malice. 508 N.E.2d at 79-80.

In this case, there is no evidence of reckless or excessive publication, and the allegedly defamatory material was published to ABIM who had a direct interest in monitoring plaintiff's development and performance as a resident doctor in its national certification program. Accordingly, the Court finds that the statements are covered by the common law conditional privilege. See id. Moreover, the Court finds that no evidence has been presented, other than plaintiff's unsupported disagreement with the statements documenting his performance, to find that any statements were made or compiled in a malicious manner. As the "truth or falsehood of the allegedly defamatory remark is not material" in considering the conditional privilege at summary judgment, the Court finds that defendant is entitled to the qualified [*37] privilege and its motion will be allowed as a matter of law on the remaining portion of Count IV. n4 See Dexter's Hearthside Restaurant, Inc. v. Whitehall Co., 24 Mass. App. Ct. 217, 508 N.E.2d 113, 117 (Mass. App. Ct.), rev. denied, 400

Mass. 1104, 511 N.E.2d 620 (Mass. 1987); see also Arsenault v. Allegheny Airlines, Inc., 485 F. Supp. 1373, 1379 (D. Mass.), aff'd, 636 F.2d 1199 (1st Cir. 1980), cert. denied, 454 U.S. 821, 70 L. Ed. 2d 93, 102 S. Ct. 105 (1981).

n4 The other portions of Count IV of plaintiff's complaint alleging intentional and negligent infliction of emotional distress were disposed of upon defendant's motion to dismiss. See Ahmed v. Berkshire Medical Center, Inc., 1995 U.S. Dist. LEXIS 22082, C.A. No. 94-30250-FHF, Memorandum and Order (D. Mass. February 16, 1995).

V. CONCLUSION

For the above reasons, defendant's motion for summary judgment is GRANTED. Plaintiff's cross-motion for summary [*38] judgment is DENIED.

It is So Ordered.

Frank H. Freedman

Senior United States District Judge