# Exhibit C


mass.gov home • online services • state agencies    SEARCH MASS.GOV



# Uncompensated Care Pool

Overview
General Information
- Uncompensated Care Pool Reports, Utilization, and Demonstration Projects

Surcharge Payer Information
Hospital and Community Health Center Information
- Free Care Applications
- The 2004 Federal Poverty Income Guidelines
Regulations Governing the Uncompensated Care Pool
Report of the Special Commission on Uncompensated Care (7.7 MB pdf)

Consumer Information: Resources for Health Care

---

## Overview

The Uncompensated Care Pool (the Pool) provides access to health care for low income uninsured and underinsured residents of Massachusetts. Established in 1985 and administered by the Division of Health Care Finance and Policy, the $345 million Pool is funded through a $215 million assessment on hospitals' private sector charges, a $100 million surcharge on payments from private sector payers to hospitals and ambulatory surgical centers, and a $30 million contribution from the Commonwealth of Massachusetts.

The Pool pays for medically necessary inpatient and outpatient services provided by hospitals and community health centers. The Pool is not insurance, and it does not pay for the cost of services provided by independent groups such as private physicians and specialty care groups. It can, however, provide some assistance to patients who are either uninsured or underinsured and who meet the Pool's income and residency criteria.

Patients with family incomes under 200% of the Federal Poverty Guidelines are eligible for full free care, and those with family incomes between 200% and 400% are eligible for partial free care. Patients at any income level may also be eligible for the Pool if medical costs deplete the family's income and resources so that the patient is unable to pay for necessary medical care. A one-page overview, The Massachusetts Uncompensated Care Pool, covers benefits, screening, eligibility criteria, and the most recent Federal Poverty Guidelines.

## General Information

**Uncompensated Care Pool Reports**

- PFY03 Uncompensated Care Pool Annual Report (pdf) This report contains complete information on PFY03. It contains a significant amount of technical information about the Pool, including an update on the status of the Pool as of the end of PFY03, the sources of funding, and the uses of Pool funds. It also contains detailed information on Pool liability to hospitals, information on payments to community health centers, Pool surplus/shortfall analyses, and information on final settlements with hospitals. Calculations contained in this report are based upon the most recently available data from the Division of Health Care Finance and Policy. The Division uses a Pool Fiscal Year (PFY) for its calculations, which corresponds to hospitalsÕ fiscal year (October1 to September 30). This report contains the most up-to-date figures available for PFY03.

- The Uncompensated Care Pool Annual Report for 2002

- Uncompensated Care Pool Annual Report for 2001 (pdf)

These reports are available as Portable Document Format (pdf) files. These files may be viewed on screen, downloaded or printed to your local printer. You will need the Adobe Acrobat Reader (version 4.0 or higher) to view these files.

**Utilization**

In PFY2002, the Pool paid for an estimated 30,000 inpatient admissions and 2 million outpatient visits. The most common users of the Pool are young adults ages 19-44 with incomes under the Federal Poverty Guidelines. More men than women use the Pool to pay for inpatient services, while more women use the Pool to pay for outpatient services.

Over 80% of inpatient services paid for by the Pool are provided on an emergency or urgent basis. Over 35% of outpatient services paid for by the Pool were provided in an emergency department. Discharges for circulatory and digestive system diagnoses represent the greatest share of inpatient charges for free care patients. Mental health and alcohol and drug-related disorders represent a much greater share of inpatient free care charges than they do for other payers, including MassHealth.

Additional information is available in the Uncompensated Care Pool PFY 2002 Utilization Report.

**Demonstration Projects**

- Community and Clinic-based Demonstrations: Improving Care and Reducing Costs for the Uninsured and Underinsured

- Congestive Heart Failure

About Us
Top of Page

| Home | Regulations | Library | Data | Contact Us | Search |

Copyright © 2004 Division of Health Care Finance and Policy

**Commonwealth of Massachusetts**
**Privacy Policy**

# The Massachusetts Uncompensated Care Pool

## Benefits

The Massachusetts Uncompensated Care Pool pays for medically necessary services provided by acute care hospitals and community health centers (CHCs) to low-income uninsured and underinsured people. Patients can apply for free care at any acute care hospital or CHC.

## Screening

Hospitals and CHCs are required to screen patients for eligibility for other government programs, particularly MassHealth, before approving them for free care. If patients appear likely to be eligible for MassHealth and wish to apply, the provider must assist them with the application process. Patients who do not wish to apply for another program are not required to do so.

## Eligibility Criteria

| Free Care Category | Income Criteria |
|---|---|
| **Full Free Care** | Income Less than 200% of the Federal Poverty Income Guidelines |
| **Partial Free Care** (patient pays a deductible on a sliding scale based on income) | 200% to 400% of the Federal Poverty Income Guidelines (FPL) |
| **Medical Hardship** (pool pays for extraordinary medical bills beyond the patient's ability to pay) | Any income level |

### 2002-2003 Income Guidelines (effective January 7, 2003)

| Family Size | Full Free Care 200% FPL | Partial Free Care 400% FPL |
|---|---|---|
| 1 | $ 17,960 | $ 35,920 |
| 2 | $ 24,240 | $ 48,480 |
| 3 | $ 30,520 | $ 61,040 |
| 4 | $ 36,800 | $ 73,600 |
| 5 | $ 43,080 | $ 86,160 |
| 6 | $ 49,360 | $ 98,720 |
| For each additional person, add: | $ 6,280 | $ 12,560 |

Massachusetts Division of Health Care Finance and Policy  February 2003

# Exhibit D

boston.com

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# Baystate Medical sued over billing practices

The Boston Globe

## Uninsured allegedly faced overcharges, aggressive collections

By Liz Kowalczyk, Globe Staff | July 28, 2004

Lawyers who are taking on the nonprofit hospital industry yesterday filed their first lawsuit in Massachusetts, claiming that Baystate Medical Center overcharges uninsured patients for medical care and uses aggressive techniques to collect its money.

Attorneys filed a lawsuit in US District Court in Boston seeking class-action status against the medical center in Springfield, the latest in a series of cases against 46 nonprofit hospital systems in 21 states over their billing practices of uninsured patients. Attorney Richard Scruggs, the Mississippi lawyer who helped win a $206 million settlement from the tobacco industry for the states, is coordinating a group of plaintiff's attorneys who are bringing the lawsuits.

Lead plaintiff Diane Harrington, 49, fell down some stairs two years ago, and was rushed by ambulance to Baystate, where doctors treated the cuts and bruises on her face and kept her overnight as a precaution. But when Harrington, who doesn't have health insurance, didn't pay her medical bill, the hospital's lawyers sued Harrington for $2,983.04, tacked on 12 percent annual interest, and threatened to seize her personal property, according to court documents.

Scruggs and his fellow attorneys argue the hospitals are violating their agreements with the federal and state governments to provide charity care for the poor in return for substantial tax breaks. Specifically, Scruggs says hospitals overcharge the uninsured and then use aggressive collection techniques, such as seizing their homes, to collect money they can't afford to pay.

Jane Albert, director of public affairs for Baystate, said the hospital doesn't comment on pending litigation, and that executives had not seen the lawsuit. But she said the hospital provides more than $15 million annually in free care for uninsured patients. The class action lawsuits also name the American Hospital Association as a defendant, saying it advises its members to engage in these billing and collection practices.

"Our view is that the lawsuits are misdirected and baseless," said spokeswoman Alicia Mitchell for the Washington trade and lobbying group for hospitals. "They divert focus away from the real issue of how we as Americans are going to extend health insurance to everyone."

Hospital billing practices are coming under growing scrutiny. Last month, congressional leaders began a series of hearings about whether hospitals should disclose their prices to consumers and about how hospitals bill and collect money from patients.

Hospital billing policies generally have a much greater impact on the poor and uninsured than on anyone else. This is because hospitals often charge the uninsured the full price, a sort of "sticker price," for medical care. But they significantly discount their prices for insured patients. Health plans negotiate these discounts in return for including the hospital in its approved network.

"The poor are paying more for medical than the rest of us," said Boston attorney Thomas Greene, who is Harrington's lawyer. "The hospitals are not putting money back into the community by providing charity care, like they're supposed to."

Hospital attorneys say that's generally not true. Stephen Weiner, a lawyer with the Boston firm Mintz Levin, which represents several large hospitals, said "the Internal Revenue Service guidelines with regard to what makes a hospital a charity don't support the position the plaintiff lawyers are taking."

While free care, or charity care, is a component, he said, the IRS looks at many other factors when providing nonprofit hospitals with tax breaks, including whether they provide emergency rooms that are open to the public, if their boards are representative of the community, and whether they provide health education programs. "Free or discounted medical care is helpful, but it's not a requirement," he said.

Massachusetts healthcare executives don't have a good handle on the problem of aggressive hospital billing here, although many believe it's less severe because of the state's so-called free-care pool. The special fund helps uninsured and sometimes even insured patients pay all or part of their medical bills, based on a sliding income scale. Even middle-class patients can get some help when facing huge hospital bills. And many hospitals complain they lose thousands of dollars because the free-care pool only reimburses part of their costs.

But apparently even in Massachusetts, the free care system has holes for patients.

Greene wasn't sure why Harrington apparently didn't get "free care." It could be because she lived in New Jersey at the time and was visiting her sister in Springfield when she fell down the stairs at her apartment building. Harrington, a temporary laborer for a firm called Labor Ready, did not have the money to pay the hospital bill -- even though Baystate offered to allow her to pay $50 a month, Greene said.

"I agree that Massachusetts is a cut above any other state I'm aware of in terms of making sure people aren't being gouged," Scruggs said. "But the ingenuity of hospital administrators and the groups going around showing them how to maximize profits knows no bounds either."

Scruggs said he considers suing hospitals that: Have lots of cash and assets, use highly aggressive collection techniques, and charge uninsured patients more for medical care then they do patients with insurance or Medicare and Medicaid, the federal and state programs for the elderly and poor. He said his goal is to force a national standard dictating how much charity care hospitals must provide, and prohibiting them from charging uninsured patients more than they charge the Medicare program.

"Sadly we find systems that are really unaware of the impact their policies have had on families with inadequate coverage," said Catherine Dunham, president of the Access Project, a healthcare advocacy organization affiliated with Brandeis University. "I honestly don't think they intend to create this kind of trouble. They're caught in a bind between being corporate medical institutions and nonprofits."

*Liz Kowalczyk can be reached at kowalczyk@globe.com.*

© Copyright 2004 The New York Times Company

# Exhibit E



## Lawsuit ends on care bills

By Jennifer Heldt Powell
Friday, August 6, 2004

Lawyers challenging the billing practices of nonprofit hospitals said yesterday that they had settled with a Mississippi hospital group in a deal that they hope will become a model for settlements with others, including Bay State Health System in Springfield.

Under the deal outlined yesterday, North Mississippi Medical System will donate more care to uninsured patients and refrain from putting liens on the homes of people who don't pay their bills.

The arrangement, which includes a range of free and discounted care, will be applied retroactively for three years.

Richard Scruggs, a lawyer who won class-action settlements against the tobacco industry, is the driving force behind the spate of class-action lawsuits.

So far, 40 actions have been brought against hospitals in more than 20 states.

``This opens the way and sets a model for a global resolution of this issue,'' Scruggs said yesterday. ``This is what we consider to be a reasonable resolution to the crisis of the uninsured in America.''

Bay State Health officials declined to comment because they had not yet seen the agreement.

Scruggs said that while the Massachusetts free care system is generous, even more can be done.

``Massachusetts has done an admirable job, probably better than any other state that I am aware of,'' Scruggs said. ``But it doesn't go quite as far as this (settlement).''

He said the settlement isn't a one-size-fits-all plan and can be modified as necessary for particular health care systems.

But local hospital leaders say there is already a strong system to help the uninsured.

``There's a lot being done for patients now,'' said Paul Wingle, spokesman for the Massachusetts Hospital Association. ``It's hard to know what they might want beyond what we're doing now.''

The American Hospital Association said the agreement shouldn't be seen as a model, especially because Mississippi hadn't yet been named in a suit.