IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DIANE HARRINGTON, On Behalf of Herself and All Others Similarly Situated, | ) ) ) | Civil Action No.: 04-11663RCL |
| Plaintiff | ) ) | |
| vs. | ) ) | |
| BAYSTATE MEDICAL CENTER, BAYSTATE HEALTH SYSTEM, INC., AMERICAN HOSPITAL ASSOCIATION, and JOHN DOES 1 THROUGH 10. | ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS BAYSTATE MEDICAL CENTER, INC. AND BAYSTATE HEALTH SYSTEMS, INC.

Plaintiff Diane Harrington submits this memorandum in opposition to the motion to dismiss of Defendants Baystate Medical Center, Inc. and Baystate Health Systems, Inc. ("Baystate Defendants"). For the reasons set forth below, the motion should be denied.

### I. BACKGROUND AND STATEMENT OF FACTS

The Baystate Defendants represent themselves as a Massachusetts based, tax-exempt, charitable, nonprofit hospital system. They have operated free from federal and state taxes because they have promised the government that they would operate as a not-for-profit charity provider of health care and that they would not engage in business "directly or indirectly, for the benefit of private interests." In reality, the Baystate Health Defendants have charged inflated rates to uninsured patients that significantly exceeded the rates charged to patients with health insurance or those covered by Medicare or Medicaid. The Baystate Defendants have inflated the charges for patients without health insurance to boost the "surpluses" – a euphemism for the profits they are not legally allowed to accrue. These profits, however, have come at the expense of uninsured patients,

who are subjected to oppressive and humiliating debt collection activities, and who, due to their precarious financial conditions and limited access to legal resources, are frequently subjected to lawsuits and default judgments.

Plaintiff, Diane Harrington, is currently unemployed and uninsured. In April 2002, Plaintiff traveled from New Jersey to Massachusetts to visit her ailing mother. At the time, Plaintiff worked as a temporary employee and had no health insurance coverage. She was seen at Baystate Medical Center for traumatic injuries she suffered as a result of a fall. As a condition of her treatment, she was required to sign forms agreeing to the payment of unspecified medical charges. After her discharge, the Baystate Defendants engaged in extensive dunning in an attempt to collect more than $3,000.00 in medical bills. The Baystate Medical Defendants charged Ms. Harrington full undiscounted rates which significantly exceeded the rates charged for insured patients or patients with insurance, Medicaid or Medicare coverage.

The Baystate Medical Defendants sued Ms. Harrington for her medical debt and obtained a default judgment against her for $2,983.00 in January 2004.[1] Ms. Harrington is unemployed and now lives with her adult daughters in Massachusetts. She was never offered financial assistance by the Baystate Defendants. She filed this action for herself and others similarly situated in July 2004.

## II. ARGUMENT

### A.    Standard of Review

Dismissal of a complaint is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, a court "must view the facts presented in the pleadings and all

---

[1] Paragraph 47 of the Complaint states that the Baystate Defendants obtained the default judgment in January 2002. This is incorrect; the actual date is January 9, 2004. This error will be corrected in an amended to the Complaint.

reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party." GE Capital Mortg. Servs. v. Estate of Lugo, 319 F. Supp. 2d 127, 130 (D. Mass. 2004).

**B.    Res Judicata**

Defendants' attempt to dismiss the action based on res judicata fails for several reasons. First, res judicata, or claim preclusion, is an affirmative defense to be raised by answer and is not generally an appropriate matter to be raised in a motion to dismiss.   See Fed.R.Civ.P. 8(c) (expressly listing res judicata as an affirmative defense).   See Boyd v. Jam. Plain Co-Operative Bank, 7 Mass. App. Ct. 153, 157, 386 N.E.2d 775, 778 (Mass. App. Ct. 1979).[2]  The party asserting res judicata as an affirmative defence bears the burden of proof and must prove either from the record of the former action or from extrinsic evidence the subject matter decided in the earlier judgment.   Fabrizio v. U. S. Suzuki Motor Corp., 362 Mass. 873, 874, 289 N.E.2d 897 (Mass. 1972).   Defendants have not offered any evidence to meet their burden of proof on the affirmative defense, and thus a motion to dismiss cannot be sustained on these grounds.

Second, res judicata will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation.   City of Salem v. Mass. Comm'n Against Discrimination, 44 Mass. App. Ct. 627, 638, 693 N.E.2d 1026, 1035 (Mass. App. Ct. 1998).   In this case, the default judgment against the Plaintiff was procured in the Springfield Division of District Court.[3]  The District Court in the Springfield lacked the power to award the full measure of relief sought by the Plaintiff, including among other things the 93A class action claims of Count 5 and the

---

[2] Plaintiff agrees with the Baystate Defendants that the preclusive effect, if any, of a prior state court judgment is decided by Massachusetts law, not federal law.

[3] Defendants' reliance on the default judgment is a red herring. First, the Plaintiff could if necessary file a motion to set aside the default judgment and file all of these same claims as counterclaims. This would, of course, produce an absurd result, as a District Court would be beset with a case that was unrecognizably different than the one before. The prayers for relief alone would require removal to Superior Court; the numerous federal questions raised would likely return this case back to federal court, only to present these same issues.

equitable relief sought in Count 8. See M.G.L. ch. 231A, § 1; see also Smith v. Caggiano, 12 Mass. App. Ct. 41, 46, 421 N.E.2d 473, 477 (Mass. App. Ct. 1981).

Third, the requisite identity of parties is lacking. The earlier default judgment was between Baystate Medical Center as plaintiff and Ms. Harrington as defendant. This case involves Ms. Harrington, on behalf of herself and as class representative, as the plaintiff, and several defendants, only one of which is Baystate Medical Center. There were no previously litigated claims involving Baystate Health Systems, Inc. and any of the other Defendants, and the Baystate Defendants have not alleged and or demonstrated that there exists privity between themselves or any of the other Defendants that were not a party to the default judgment.

Fourth, Defendants assume the Springfield District Court default judgment is a valid judgment for res judicata purposes. For the reasons set forth in In re Brennan, 275 B.R. 172, 176 (Bankr. D. Mass. 2002), it is doubtful that the default judgment in this case is entitled to any finality. A default judgment is entitled to finality only if the Plaintiff had a "full and fair opportunity" to defend its position. Id. citing MacEachern v. S.S. White Dental Mfg. Co., 304 Mass. 419, 23 N.E.2d 1020 (1939). Here, the Plaintiff, an unemployed and uninsured patient, did not and could not have known that she was being charged a higher rate than an insured person for the same medical services—this fact was never disclosed to her. Thus she could not have had "full and fair opportunity" to litigate her claims. Moreover, a default judgment will not be given preclusive effect if there is fraud or collusion involved in obtaining the default. 275 B.R. at 176 citing Riehle v. Margolies, 279 U.S. 218, 225, 49 S. Ct. 310, 313 (1929). The Plaintiff has alleged that the Defendants have engaged in a fraudulent and collusive pattern of "false justification, concealments and misrepresentations... [to] charge the Plaintiff and the Class substantially more than its insured patients for the same medical services." Complaint ¶ 110. Taking the Plaintiff's

allegations of concealment as true, as this Court must, there are no grounds to give the default judgment any finality.[4]

Fifth, the requisite identity of claims is lacking. The default judgment obtained by Baystate Defendants in its collection action against Ms. Harrington is not the same subject matter and was not provable by the same evidence as the causes of action brought here by Plaintiffs and the members of the Class for breach of various duties under federal and state laws. See Heacock v. Heacock, 402 Mass. 21, 24, 520 N.E.2d 151, 153 (Mass. 1988) ("tort action is not based on the same underlying claim as an action for divorce"). The earlier case was strictly a debt collection action against Ms. Harrington. The instant case concerns the breach of an entirely different contract — a contract between the Baystate Defendants and the United States government brought on behalf of the Plaintiff and those similarly situated, who are the intended beneficiaries of that contract.

Baystate Defendants incorrectly assert that all of Plaintiff's causes of action were compulsory counterclaims. However, when one examines the criteria used in the First Circuit to make such a determination, see McCaffrey v. Rex Motor Transp., Inc., 672 F.2d 246, 248 (1st Cir. 1982) (citing 6 Wright & Miller, Federal Practice and Procedure § 1410, at 42 (1971)), it is evident the Plaintiff's federal and state claims are radically different. The present action raises factual issues that are completely independent of and unrelated to the provision of medical services. These issues include the tax exempt status of various health care providers, the rates and billing practices relating to insured and uninsured patients, the coercive and unfair nature of practices used to illegally condition emergency medical treatment on an ability to pay, and the use of unfair and illegal practices to pursue the debt. Second, it is clear that res judicata would not exist absent the compulsory counterclaim rule, a significant indication as to whether a counterclaim is

---

[4] Moreover, it is doubtful the default judgment will remain in place. Plaintiff can (and will, if necessary, move to vacate the default under Mass.R.Civ.P. 60(b)(1) and (2). She would then plead a counterclaim and seek to have the case removed from the District Court to this court, to be consolidated with this action.

"compulsory." The claim preclusion rule is to prevent the re-litigation of claims, but the vast majority, if not all, of Plaintiff's claims would never have been litigated in the collection proceedings. Third, the evidence necessary for the Plaintiff to prove her claims (under, inter alia, 26 U.S.C. § 501(c)(3), M.G.L. c. 93A, and EMTALA) bear no relation to the evidence that was necessary for the Baystate Medical Center to prove its debt. Finally, there is no logical relation between the debt collection action and the causes of action in the present case. A counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. See Xerox Corp. v. SCM Corp., 576 F.2d 1057, 1059 (3d Cir. 1978). It is apparent that there will be no significant duplication of effort or time in trying the Plaintiff's claims.

Res judicata does not attach when the claims asserted in the second suit could not have been asserted in the first one. See Mass. Sch. of Law v. ABA, 142 F.3d 26, 38 (1st Cir. 1998). At the time of the default judgment, the Plaintiff did not and could not have known that she was the victim of a discriminatory, unfair and illegal scheme to inflate profits. This is because the Defendants used a pattern of "false justification, concealments and misrepresentations… [to] charge the Plaintiff and the Class substantially more than its insured patients for the same medical services."[5]  Complaint ¶110. Plainly, a plaintiff cannot allege a conspiracy to collect unlawful charges through bullying collection tactics and exploitation of the legal system until the course of conduct has been concluded. To rule otherwise would mean that an uninsured consumer, who was victimized by a

---

[5]  A West Virginia case, Blake v. Charleston Area Med. Ctr., 201 W. Va. 469, 498 S.E.2d 41 (1997), is directly on point. In Blake, a patient incurred hospital expenses of approximately $35,000. Blue Cross paid all but $3,092.10 of these charges. The hospital sued the patient for the balance and the patient "believing that [he] owed the sum sought by" the hospital, did not appear to defend the action. The hospital obtained a default judgment. Subsequently the patient learned the hospital could not legally collect any balance not covered by insurance from the patient. When the patient filed suit against the hospital, the hospital moved to dismiss based on res judicata. The West Virginia Supreme Court rejected the hospital's claim of res judicata, holding that the patients claims for misrepresentation pertaining to the right to collect the purported debt and wrongfully enforcing a judgment "are clearly different and distinct" from the earlier cause of action based on the solely debt. Id. at 478.

scheme to obtain default judgments from unsophisticated individuals could never bring a claim to remedy such abusive practices.  Clearly, res judicata cannot be used to deny the most vulnerable persons the ability to prevent the trial courts from being cynically used against them.

### C.    Arguments Relating to Specific Counts

####    1.    Count 1—Breach of Contract

**(a)    Existence of a contract:**  A hospital's application for and receipt of tax-exempt status pursuant to 26 U.S.C. §501(c)(3) creates a contract that obligates the hospital to provide services for the benefit of the medically indigent.  The hospital is required to assure the government that it will provide **significant** medical services to the medically indigent to maintain its tax exemption.  When medically indigent persons are charged inflated, discriminatory rates for medical services solely because they are uninsured, the hospital has breached its obligations and a cause of action will lie to enforce the nonprofit hospital's federal obligations.

The causes of action advanced here are not new.  They directly follow the precedents set in 42 U.S.C. § 291(c) (Hill-Burton Act).[6]  Under this line of cases, federal courts recognize that a hospital receiving federal funds and making assurances to the government that it will treat the medically indigent have contractual obligations which may be enforced by medically indigent patients as a third-party beneficiaries.  The federal courts have also recognized an implied federal right of action on behalf of indigent patients against nonprofit hospitals for failure to provide indigent care in exchange for grant monies under the Hill-Burton Act and analogous federal laws.  See Flagstaff Med. Ctr. v. Sullivan, 962 F.2d 879 (9th Cir. 1992) (hospital that received Hill-Burton

---

[6] Hill-Burton requires recipient hospitals to provide a "reasonable volume of medical services to persons unable to pay," while § 501(c)(3) requires that exempt hospitals operate "exclusively" for "charitable purposes," which 26 C.F.R. § 1.501(c)(3)(d)(2) defines as "relief of the poor and distressed or of the underprivileged," and provide "significant" charitable healthcare services to the indigent. FSA-RUL, UIL No. 501.03-11; CCH IRS Letter Rulings Report No. 1254, 03-14-01 (February 5, 2001).

funds entered into contract with federal government to provide uncompensated medical care to indigent patients; patients were entitled to recover as intended third-party beneficiaries of agreement between federal government and medical center); Saine v. Hosp. Auth. of Hall County, 502 F.2d 1033 (5th Cir. 1974) (indigent class had standing to sue non-conforming hospital under Hill-Burton because, although Act does not expressly provide for civil remedy as means of enforcing its provisions, there is implied authorization); John Muir Mem'l Hosp. v. Davis, 559 F. Supp. 1042 (N.D. Cal. 1983) (holding that hospital's acceptance of government funds under the Hill-Burton Act creates a legally enforceable free care obligation to indigent patients); Corum v. Beth Israel Med. Ctr., 359 F. Supp. 909 (S.D.N.Y. 1973) (the quid pro quo of acceptance of Hill-Burton funds was the obligation to provide uncompensated medical care to indigent patients); Organized Migrants in Cmty. Action v. James Archer Smith Hosp., 325 F. Supp. 268, 271 (S.D. Fla. 1971) (hospital "must furnish a reasonable volume of free or reduced cost services to the poor").

Just as the receipt of Hill-Burton funds created a contractual obligation on the part of the recipient to comply with the statutory conditions established by Congress, acceptance of tax-exempt status is also accompanied by enforceable obligations. Tax exemption of private organizations devoted to charitable and other purposes is based upon the theory that the government is compensated for the loss of revenue by its relief from financial burden which would otherwise have to be met by appropriations from public funds, and by the benefits resulting from the promotion of the general welfare. H.Rep. No. 1860, 75th Cong., 3d Sess. 19 (1939); see also Bob Jones Univ. v. U.S., 461 U.S. 574, 587-88 (1983); Duffy v. Birmingham, 190 F.2d 738, 740 (8th Cir. 1951). Section 501(c)(3) announces that the government is prepared to relinquish its right to collect certain taxes from a charitable organization, if it applies for recognition as a tax exempt organization and

agrees to meet the criteria set out in the law and regulations.[7]  A hospital's application and agreement to meet the statutory and regulatory criteria for tax exempt status is an offer to form a contract. The government accepts the offer by approving the application and awarding tax-exempt status. The terms of the contract in this case are straightforward. They are set out in 26 U.S.C. §501(c)(3) and regulations promulgated under § 501(c)(3). Plaintiff avers the existence of the contract based on these federal statutes and regulations and comparable state statutes and regulations.[8]

    **(b)   Existence of a Private Right Action:**  In Saine, the former 5th Circuit Court of Appeals held that indigent patients had an implied federal right of action against a hospital which breached its obligations under Hill-Burton by failing to provide reasonable charity care to patients

---

[7] The charitable requirements for a hospital to comply with §501(c)(3) and its regulations are substantial. Among other things, they require that the hospital "provide for a portion of its services and facilities to be used for charity patients...." I.R.S. Form 1023, Schedule C., ¶ 4. The hospital is also required to explain its policy regarding charity cases and provide "data on the hospital's past experience in admitting charity patients ...." Id. Further, a hospital's stated policies to provide health care services to the indigent are not sufficient to satisfy the charity care requirement of the community benefit standard under the operational test in Treas. Reg. §1.501(c)(3)-1(c), unless the hospital demonstrates that such policies actually result in the delivery of **significant** health care services to the indigent. FSA-RUL, UIL No. 501.03-11; CCH IRS Letter Rulings Report No. 1254, 03-14-01 (February 5, 2001) (emphasis added); see 26 CFR § 1.501(c)(3)(c)(1) ("An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose); 26 C.F.R. § 1.501(c)(3)(d)(2) Cf. 26 C.F.R. (defining "charitable" as "[r]elief of the poor and distressed or of the underprivileged as relief of "the poor and distressed and under underprivileged").

[8] The cases Baystate Defendants relied upon to argue that there is no contract are readily distinguishable. In Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451 (1985) several private railroads sued the United States under the Rail Passenger Service Act (RPSA), claiming that the U.S. had a contractual obligation under the Act not to re-impose rail passenger service responsibilities on the railroads. The Court concluded that the RPSA:

    expressly established the National Railroad Passenger Corporation as a nongovernmental entity ...
    and it [the RPSA] used the term 'contract' not to define the relationship of the United States to the
    railroads, but instead that of the new, nongovernmental corporation to the railroads.... Legislation
    outlining the terms on which private parties may execute contracts does not on its own constitute a
    statutory contract.

Id. at 467.  National Railroad merely held that the RPSA was legislative regulation of the rail industry, not a contract to which the government was a party.

   In Jones v. Pepsi Cola Bottling Co., 822 F. Supp. 396 (E.D. Mich. 1993) the plaintiff alleged a contract between a city and a company "wherein the City granted Pepsi a tax abatement for the new DPC in return for Pepsi's promise to transfer Exeter Avenue employees to the new DPC." Id. at 403. The Court rejected that claim because, under state law, the city had no authority to grant a tax exemption. Id. at 404. That a contract cannot exist where one of the parties has no legal authority to enter into the contract is hardly groundbreaking precedent and. It is totally irrelevant to this case the case at bar, where the federal government's authority to accept an offer of tax exemption or enter into a contract is indisputable.

unable to pay for such care. 502 F.2d 1033 (5th Cir. 1974). The Fifth Circuit held "[t]here is no express authorization but we hold there is implied authorization" for private civil remedies as a means of enforcing the Hill-Burton Act's provisions requiring a reasonable volume of hospital services to persons unable to pay. Further, that "a civil remedy may be implied for those clearly within the protective realm of legislation or regulations in the public interest." 502 F.2d at 1033.

Under similar circumstances, the Supreme Court has allowed federal causes of action to proceed under contract theories. See Norfolk & Western R. Co. v. Nemitz, 404 U.S. 37 (1971) (railroad employees made out federal claims when they sought to enforce assurances made by the railroad to secure the Interstate Commerce Commission's approval of a railroad consolidation pursuant to the Interstate Commerce Act); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 (1979) (Supreme Court permitted a federal suit for rescission of a contract declared void by §215 of the Investment Advisers Act of 1940). It follows that when Congress permits the formation of a contract, the necessary implication is that the customary legal incidents of the contractual relationship would follow, including legal actions for breach. Transamerica, 444 U.S. at 19.

The true touchstone of the implied private cause of action test is whether the court can imply that Congress intended to create a private cause of action. As previously discussed, courts properly imply that when a statute permits the formation of a contract with the government -- not by mandate, but under a regime of offer, acceptance and consideration. In such cases, it is proper to imply that Congress intended that contractual remedies would be permitted. See, e.g., Nemitz; Lewis; Saine; and Flagstaff.

    (c)    **Plaintiff is an Intended Beneficiary:** The proper test for determining third-party

beneficiary status under the federal common law[9] is whether the contract reflects the express or implied intention of the parties to benefit the third party." Schuerman v. United States, 30 Fed. Cl. 420, 433 (Fed. Cl. 1994). "The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby." Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997); see also Holbrook v. Pitts, 643 F.2d 1261 (7th Cir. 1981) (tenants of housing project have enforceable rights as third party beneficiaries of Section 8 contract between HUD and project owners.

Here, the underlying purpose of the tax exemption is to assure that the Baystate Defendants' activities will "actually result in the delivery of **significant** health care services to the indigent." FSA-RUL, UIL No. 501.03-11. Under § 501(c)(3), the Baystate Defendants were required to be "organized and operated exclusively for...charitable purposes." As used under the IRS Regulations, the term charitable is construed to encompass "relief of the poor and distressed or of the underprivileged." 26 C.F.R. § 1.501(c)(3)-1(d)(2). A hospital which promotes the health of a limited class of beneficiaries, such as insured patients, serves the private interests of those individuals, and is not deemed to be organized and operated exclusively for a charitable purpose. Rev. Rul. 69-545. Persons in need of financial relief, including uninsured medically indigent patients, are the specific intended beneficiaries of the Baystate Defendants' agreement with the federal government that it will operate exclusively for charitable purposes.

(d) **Plaintiff has Standing:** Plaintiff's standing to bring these claims has been definitively determined by the analogous Hill-Burton cases. United States Courts of Appeal have

---

[9] It is undisputed in this case that contracts of the Federal Government are normally governed, not by the particular law of the states where they are made or performed, but by a uniform federal law. Keydata Corp. v. U.S., 504 F.2d 1115, 1124 (Ct. Cl. 1974). Otherwise, the application of state law "would lead to great diversity in results making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain." Clearfield Trust Co. v. U.S., 318 U.S. 363, 367 (1943); see also Falls Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d 49, 55 fn. 4 (2d Cir. 1985) (contracts with the federal government are governed by federal common law); Caudill v. Blue Cross & Blue Shield of N.C., 999 F.2d 74 (4th Cir. 1993) (federal common law governs the duties and obligations of the federal government under contracts to which it is a party).

regularly ruled that third-party beneficiaries of Hill-Burton funds have standing to bring suit.

Flagstaff v. Sullivan, 962 F.2d 879 (9th Cir. 1992) (patients eligible for uncompensated care under

the Hill-Burton Act had standing to sue hospital for its failure to provide such care as third party

beneficiaries to contract); Saine v. Hospital Auth. of Hall County, 502 F.2d 1033 (5th Cir. 1974)

(indigent class had standing to sue non-conforming hospital under Hill-Burton); Euresti v. Stenner,

458 F.2d 1115 (10th Cir. 1972) (civil remedy may be implied for all those within protective realm

of legislation or regulation in public interest and such right is not dependant on existence of formal

contractual relationship); see also Penn v. San Juan Hosp., Inc., 528 F.2d 1181 (10th Cir. 1975)

(class action by indigent patients claiming breach of duty by hospital to provide indigent care under

§501(c)(3) allowed to proceed).  Both Hill-Burton and Section 501(c)(3) were enacted to provide

government benefits to nonprofit hospitals in exchange for the hospitals' of significant charity care

to indigent and uninsured patients.  Both the Hill-Burton cases and this case involve the same

category of defendants (not-for-profit hospitals) and the same class of plaintiffs (indigent and

uninsured patients).  The cases are directly on point.[10]

### 2.   Count 2—Breach of Contract

   To create a basis for dismissing Plaintiff's second cause of action, the Baystate Defendants

recharacterize the Plaintiff's allegations.  They claim that the Complaint alleges that the Plaintiff

unconditionally agreed to pay any rate charged by Baystate.  But that is not what the complaint

---

[10] The cases cited by the Defendants are inapposite.  In Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26 (1976), where the Supreme Court considered whether plaintiffs had standing to challenge an IRS Revenue Ruling.  The plaintiffs sued only the officials of the Department of Treasury, not the hospitals that had denied them service.  Id. at 41. For that reason alone, Simon is completely distinguishable.  Second, the complaint alleged only that the new IRS revenue ruling "encouraged" the hospitals to deny services to the indigent and, based on the limited averments in the complaint, the Court reasoned it "is purely speculative whether denials of service . . . can be traced to [the IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." Id. at 42-43.[10]  Here, the well-pled allegation of "encouragement" comes from the Defendants own statements that they are required to charge these excessive rates.
   Zimmerman v. Cambridge Credit Counseling Corp., 322 F. Supp. 2d 95, 101 (D. Mass., 2004), is similarly distinguishable.  In that case, there was no allegation that the credit counseling firm's tax-exempt status caused it to charge the Zimmermans unfairly or even more than it did other customers.  Instead, the Zimmermans merely alleged that they chose the company "because they assumed a nonprofit would charge lower rates."

alleges. What the plaintiff has actually pled is the existence of an express contract between the plaintiff and the Baystate Defendants that required the plaintiff to compensate them for the services received, but did not specify the amount to be paid; only that such amount would be set by the Baystate Defendants in their "sole discretion." Complaint ¶ 71. The Complaint further alleges that the parties express contract contained "the express and/or implied contractual obligation by the Baystate Health Defendants that they would charge the Plaintiff and the Class no more than a fair and reasonable charge for such medical care."

Plaintiff can plainly state a cause of action. If she can establish that Baystate was contractually obligated to only charge "fair and reasonable charges," either because such a term was expressly agreed upon or because the term was implied by law, she will have a basis to claim Defendants breached that provision by charging an excessive amount. Nor is the "reasonable price" contract provision inconsistent with the express contract as alleged in the Plaintiff's complaint. Alleging that Baystate could only charge a reasonable price is perfectly consistent with an express contract that does not specify the amount or rate of compensation to be paid. Indeed, for more than 75 years, the law in the Commonwealth has been "if no price was fixed for compensation, then there might be an implied promise to pay a reasonable sum." Altman v. Goodman, 255 Mass. 41, 44-45 (Mass., 1926). See also President & Fellows of Harvard College v. PECO Energy Co., 57 Mass. App. Ct. 888, 896 (Mass. App., 2003) (when parties to a written contract have failed to include a term that is necessary to the determination of the parties' rights, the Court will provide a term which comports with community standards of fairness).

### 3.     Count 3—Implied Covenant of Fair Dealing

In Massachusetts, the covenant of good faith and fair dealing implied in every contract requires neither party to take any action that will have the effect of destroying or injuring the right

of any other party to receive the fruits of the contract. <u>Drucker v. Roland Wm. Jutras Associates</u>, 370 Mass 383, 385 (1976). Here the plaintiff alleges that Baystate had entered into contracts to provide the Plaintiff, and persons similarly situated, with "affordable medical care" and that the charges for such care would be "fair and reasonable." Complaint ¶¶ 72, 77. Although the covenant of good faith and fair dealing prohibited Baystate from taking any action that would have interfered with the plaintiff's rights these contracts, the Complaint alleges that Defendants failed to provide the affordable and reasonably priced medical care; that they charged the Plaintiff and the Plaintiff's class an unreasonable rate that was significantly higher than rates charged to insured patients and used harassing tactics to collect funds they were not entitled to receive. Complaint ¶ 78. Plainly, such allegations state a claim that Defendants improperly took actions that were intended to destroy or injure the Plaintiff's contract rights. Moreover, contrary to Baystate's assertion, the terms of the Baystate's contracts, as alleged in paragraphs 29, 30, 66, 67, 71 and 72 of the Complaint, do not condone or permit the conduct Plaintiff alleges as a violation of the covenant of good faith and fair dealing.

      4.    <u>Count 4—Breach of Charitable Trust</u>

The Plaintiff voluntarily dismisses this Count.

      5.    <u>Count 5—Unfair and Deceptive Practices under M.G.L. ch. 93A § 1 et seq.</u>

Defendants argue that their billing rates and collection methods are exempt transactions pursuant to the so-called "permitted practices" exemption of M.G.L. ch. 93A § 3. This is a narrow and rarely granted exemption that permits certain practices that are "otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States." M.G.L. ch. 93A §3. Section 3 expressly states that the burden of proving the existence of this exemption is on the "person claiming the exemption" — the

Baystate Defendants. State and federal courts in the Commonwealth have found this burden to be "heavy," requiring a defendant to "show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively permits the practice which is alleged to be unfair or deceptive." See Rini v. United Van Lines, 903 F. Supp. 224, 231 (D. Mass., 1995), reversed on other grounds, 104 F.3d 502 (1st Cir. 1997) (emphasis added). The Defendants' memorandum fails to cite even a single rule or regulation[11] that affirmatively permits the practice of charging uninsured patients excessively and thus fails to meet the "heavy burden" required by chapter 93A § 3.

Defendants next argue that the Baystate Defendants are not subject to 93A liability because they are not engaged in "trade or commerce" as defined by the statute, presumably because they are not-for-profit organizations. The Supreme Judicial Court has held, however, that an entity's "status as a 'charitable' corporation is not, in and of itself, dispositive of the issue whether ch. 93A applies." Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 23, 679 N.E.2d 191, 207 (Mass. 1997). The sole inquiry is whether the defendant was engaging in "the sale, rent, lease or distribution of any services and any property." Id., at 24, 207 (emphasis added); see also M.G.L. ch. 93A § 1(b). The crux of 93A's broad sweep is whether the defendant is acting in a "business context." See Lantner v. Carson, 374 Mass. 606, 611, 373 N.E.2d 973, 976 (Mass. 1978). In Linkage Corp., Boston University was held to be subject to 93A because, even though its "status required that it remain a nonprofit corporation, it nonetheless was motivated by a strong desire to

---

[11] The only case the Defendants cite, Bierig v. Everett Square Plaza Assocs., 34 Mass. App. Ct 354, 611 N.E.2d 720 (1993), is inapposite for a variety of reasons. First, Bierig concerned allegedly excessive rents charged to tenants in public housing; it had nothing to do with healthcare rates. Id. at 355, 72. Second, in Bierig, the conduct in question involved charging certain tenants, known as "market tenants," whose incomes were above a specified threshold, higher rents than the tenants whose incomes fell below that threshold. As the Court noted, the "statutory scheme of the Act expressly permitted rents for market tenants to be above the below-market rates and implicitly required it." Id. at 367-68, 728. Defendants cannot argue that charging uninsured, and possibly indigent, patients more than other patients is "expressly permitted" or even "implicitly required" by the state and federal regulations involved.

benefit as much as possible from its arrangement with [the plaintiff]." 425 Mass. at 25, 679 N.E.2d at 208. The Plaintiff has alleged, and the Defendants do not dispute, that the conduct in question arises from precisely the Defendants' similar "strong desire to benefit as much as possible."

Linkage Corp. expressly distinguishes the sole case cited by the Baystate Defendants, All Seasons Servs. v. Commissioner of Health & Hosps., 416 Mass. 269, 271, 620 N.E.2d 778, 780 (Mass. 1993). In All Seasons, on a motion for summary judgment, the Court held that contracting for food services was "merely incidental to the hospital's primary function of providing medical services." In Linkage Corp., the SJC recognized that this doctrine does not apply if the non-profit defendant "sought to profit from its transaction with the plaintiff." 425 Mass. At 24, 679 N.E.2d at 207, n. 34. Here, Plaintiff alleges that profit was the entire purpose of the transaction. At a minimum, a question of fact exists which cannot be determined until summary judgment.

The Baystate Defendants also argue that the alleged conduct cannot be a violation of Chapter 93A as a matter of law. Whether a given practice is unfair or deceptive under G. L. c. 93A must be determined from the circumstances of each case. See Noyes v. Quincy Mut. Fire Ins. Co., 7 Mass. App. Ct. 723, 726, 389 N.E.2d 1046, 1048 (Mass. App. Ct., 1979). The bounds of ch. 93A's broad reach are, in the words of the First Circuit:

> notably imprecise, encompassing any actions that attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce, have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness.

St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis, 262 F.3d 53, 66 (1st Cir. 2001).

Moreover, contrary to the Defendants' assertions, the Plaintiff has alleged pretextual behavior on the part of the Defendants. The Plaintiff has alleged that the Defendants charge "inflated rates that bear no connection to the actual cost of providing the service." Complaint ¶ 32.

Plaintiff alleges that the Defendants are "'gaming' the system to inappropriately maximize payments under federal and state medical funding programs." Complaint ¶¶ 2 – 3. The Plaintiff has also alleged that Defendants engage in deceptive conduct by leading patients to believe "that they operate a charitable hospital system on a nonprofit basis and that all excess profits are reinvested into patients." Complaint ¶ 6. This creates the reasonable belief that needy patients will receive charitable care. The Plaintiff has further alleged that the rates were in violation of known contractual obligations, specifically "express and/or implied Agreements with the United States Government, the State of Massachusetts, and local governments." Complaint ¶¶ 28, 65 – 73. Perhaps most importantly, the Plaintiff has alleged that the Defendants use their position relative to her and similarly situated patients to secure an unfair advantage. To this end, she alleges the Baystate Defendants "will not admit a patient into their emergency rooms for emergency medical care unless that patient agrees to pay the Baystate Health Defendants in full for such unspecified and undiscounted charges." Complaint ¶ 36. Illegally withholding emergency medical treatment until patients agree to pay unfair and excessive charges is tantamount to the use of physical threats to achieve the same result. Taking these serious allegations as true, a trier of fact could find such practices are unfair or deceptive.

Finally, Defendants are technically correct that the plaintiff's Chapter 93A claim should be dismissed for failure to comply with §9's demand letter requirement. The requisite demand letter was not served before filing suit. For this reason, Plaintiff is willing to voluntarily dismiss this count, without prejudice, pursuant to Fed.R.Civ.P. 41(a)(2). If Plaintiff's offer of voluntary dismissal is not accepted, Plaintiff's failure to comply with the demand letter requirement is merely a procedural basis for dismissal and cannot result in a dismissal with prejudice. York v. Sullivan, 369 Mass. 157, 165 (1975) (dismissal for failure to comply with demand letter requirement of

M.G.L. c. 93A, § 9 "should not be 'on its merits' or 'with prejudice'"). Further, it is also clear that once the plaintiff has served a demand letter on the defendants and thirty days have elapsed, she can amend her complaint to add a procedurally correct 93A claim. There is no requirement that a demand letter be served before the plaintiff initiates an action that ultimately contains a Chapter 93A claim and, ordinarily, amendment to include a 93A claim is permitted even when such a letter is not delivered until after the commencement of the litigation. Tarpey v. Crescent Ridge Dairy, Inc., 47 Mass. App. 380, 391 (1999); Danusis v. Longo, 48 Mass. App. 254, 263, n. 18 (1999).[12]

    6.    Count 6—EMTALA

    Congress enacted the Emergency Medical Treatment And Labor Act ("EMTALA") to address the disparity in medical treatment of uninsured patients in America's hospitals.[13]  In their Memorandum, Defendants ignore the fact that Ms. Harrington alleges that she was not screened medically until she signed a form guaranteeing payment[14] and thus she does allege a delay in her evaluation and treatment.  In addition, Plaintiff also alleges that she was refused "medical screening and treatment" without regard to ability to pay, which is an independent violation of the Act.[15]

---

[12] The Plaintiff intends to serve a demand letter shortly after the filing of this opposition and it is likely that the thirty day period will have expired by the time the Court is prepared to decide Baystate's motion. Because Plaintiff expects that an amended complaint will shortly contain these allegations, and because the matter has been fully briefed, Plaintiff suggests the Court address the substantive arguments for dismissing the Chapter 93A count, notwithstanding her offer of a voluntary dismissal

[13] The Act specifically prohibits the conditioning of medical examinations or stabilizing treatments based upon ability to pay and insurance status. "[A]ny individual" who has suffered "personal harm" has a private right of action. 42 U.S.C. §1395dd(d)(2)(a).

[14] Complaint ¶ 94.

[15] Complaint ¶ 94.  Defendants misunderstand EMTALA and believe that forcing patients to sign contracts to pay unspecified amounts is legally permissible under the Act.  Congress prohibited delayed screenings, even to inquire about patients' insurance status.  Clearly, Congress also prohibited delaying screenings by forcing patients in medical need to sign payment contracts.

Defendants also erroneously claim that the Plaintiff failed to allege "personal harm." In fact, Ms. Harrington repeatedly alleges "personal harm" in the form of economic injuries[16] from the combination of highly disparate billing rates,[17] conditioning medical screening examinations and treatments upon up-front guarantees to pay unspecified charges (in violation of EMTALA),[18] and aggressive collection efforts based upon these illegally obtained contracts.[19]

The Baystate Defendants ignore these allegations and then suggest by implication that "personal harm" under EMTALA is narrowly restricted to "physical injury." This is not the case. EMTALA's terms are broadly construed. In <u>Fotia v. Palmetto Behavioral Health</u>, 317 F. Supp. 2d 638, 644 (D. S.C. 2004), a whistleblower was fired after reporting his employer's EMTALA violation. The court denied a motion to dismiss on grounds similar to those advanced by the Baystate Defendants, holding that economic damages were in keeping with EMTALA's intent. "Under the plain language of § 1395dd (i), Plaintiff should therefore have a right of action." <u>Fotia</u>, 317 F.Supp at 644.[20] Similarly, EMTALA provides a cause of action to receiving hospitals that suffer economic harm as a result of improper transfer from a facility that engages in "patient dumping," even though the hospitals and their personnel sustain no physical injuries. 42 U.S.C. §1395 dd (c)(2)(b). Neither the Act nor case law support a double standard where "personal harm" includes economic damages for hospitals and whistleblowers, but not for patients themselves.

---

[16] Complaint ¶¶ 3, 31, 51, 95, and 165, <u>inter alia</u>.

[17] Complaint ¶¶ 1, 2, 7, 31, 34, and 37, <u>inter alia</u>.

[18] Complaint ¶¶ 36, 45, 94, <u>inter alia</u>.

[19] Complaint ¶¶ 1, 4, 7, 31, 37, 42, and 47.

[20] It is important to note that while the Plaintiff in <u>Fotia</u> was a whistleblower, that distinction is not relevant to that case's holding as it applies to the instant case. In <u>Fotia</u>, the court interpreted the meaning of "personal harm" under the general section of the Act that applies to "any individual." U.S.C. §1395 dd (c)(2)(b). Non-whistleblowers, such as the Plaintiffs in this case, who state claims under EMTALA do so under this same section and in accordance with the court's broad definition of "personal harm."

7.    Count 7—Unjust Enrichment

The Baystate Defendants claim there can be no unjust enrichment because they never received any payment for the services they provided. This fact, even if it was true, is not in the Complaint. When deciding a motion to dismiss under Rule 12(b)(6) motion the Court cannot consider facts outside the complaint. Maldonado v. Dominguez, 137 F. 3d 1, 6 (1st Cir. 1998).[21]

Moreover, the Plaintiff does not merely allege that the Defendants wrongfully received excessive compensation from her and the other members of the class.    She claims that because Baystate Defendants violated the implied contracts that were connected to its receipt of tax exemption status, they are in possession of tax savings and profits that they should have never received. These constitute property the Baystate Defendants clearly received. If plaintiff can prove that these funds were wrongfully received, a count for unjust enrichment and imposition of a constructive trust is the appropriate remedy.[22]

8.    Counts 8 (Injunctive/Declaratory Relief) & Count 10 (Aiding and Abetting)

As Defendants concede, Counts 8 and 10 are derivative claims. Thus, to the extent that the other claims are found viable, these claims would survive a motion to dismiss as well.

9.    Count 9—Civil Conspiracy

Massachusetts tort law recognizes two different types of civil conspiracy causes of action. Baystate only addresses one of these — the more traditional tort that requires the plaintiff to prove

---

[21] Indeed, from the allegations of the Complaint the Court must infer that Baystate received at least partial payment.. In paragraph 46 the Complaint alleges Baystate dunned the plaintiff for more than $3,000 for her medical care. However, its default judgment was only issued for $2,983. Construing the allegations in the light most favorable to the plaintiff, the Court must find that Baystate received some payment from the plaintiff. Moreover, plaintiff alleges that Baystate has wrongfully obtained a default judgment which, if enforced, would permit Baystate to receive substantial additional property.

[22] Defendants are incorrect that a constructive trust may not be imposed in the absence of fraud or breach of fiduciary duty. Under Massachusetts law, imposition of a constructive trust is the appropriate equitable remedy whenever a person's retention of funds would constitute an unjust enrichment. Foster v. Hurley, 61 Mass. App. 414, 422 (2004), Culpable conduct is not required. Id.

that the defendants "acting in unison had some particular power of coercion over the plaintiff." Fleming v. Dane 304 Mass.46 (1939).[23] This element can be satisfied, however, by an allegation that the Defendants were able to achieve the object of the alleged conspiracy collectively, but could not have accomplished such ends by themselves. Aetna Casualty Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994). Although the Complaint does not currently contain an express allegation to this effect, a fair reading of the conspiracy allegations is that the assistance of the alleged co-conspirator, American Hospital Association (the "AHA"), was critical to the ability of Baystate to continue overcharging uninsured patients and to hide the unlawfulness of Baystate's billing policies from the public and state and federal regulators. Complaint ¶¶ 105-111. To the extent the complaint does not sufficiently allege that Baystate and the AHA's actions were more coercive in concert than they would have been if taken alone, plaintiff should be permitted to amend this count of her Complaint.[24]

The Complaint plainly states a cause of action for the second type of civil conspiracy liability — concerted action. Liability under this theory of civil conspiracy exists when the defendant "knows that the . . . conduct [of another person] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Kurker v. Hill, 44 Mass. App. Ct. 184, 190 (Mass. App. Ct., 1998), citing Restatement (Second) of Torts, 876(b). See also Aetna Casualty Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564-65 (1st Cir. 1994). Under

---

[23] As the First Circuit recognized in Aetna Casualty Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563-64 (1st Cir., 1994), it is this version of civil conspiracy that is "a very limited cause of action." Liability under the second theory of civil conspiracy—which is sometimes referred to as "concerted action"—is much broader. Id. See also, Kurker v. Hill, 44 Mass App. 184 (1988).

[24] Traditional Massachusetts civil conspiracy also requires the plaintiff to establish that the conspirators were either seeking to achieve an unlawful purpose, or using unlawful means to achieve a lawful purpose. Deslauries v. Shea, 300 Mass. 30, 33 (1938). Both are alleged here. The objects of the conspiracy were unlawful– to improperly enrich non-profit hospitals by unlawfully charging excessive rates to uninsured patients, and to unlawfully maintain the hospitals' non-profit status. Complaint ¶ 105, 108. Further, the complaint also alleges unlawful conduct, including misrepresenting the billing practices as mandated by federal regulations, ¶ 106 and concealing and misrepresenting the true amount of charity care provided by Baystate and other AHA member hospitals, ¶ 108.

this theory, liability is premised on the defendant providing substantial assistance to another with the knowledge that such assistance is part of a tortious plan. Kurker v. Hill, 44 Mass App at 190. The Complaint clearly contains such allegations, describing a common plan and agreement between Baystate and the AHA to deprive uninsured patients, like the plaintiff, of their rights to reasonably priced medical services and to maintain tax exempt status without complying with the charitable obligation that accompany such status. Defendants do not even contest the existence of this type of liability.

   10.    Count 11—Unfair Debt Collections Practices Act

Defendants misunderstand the Fair Debt Collections Practices Act ("FDCPA").[25] Congress passed the FDCPA in 1977 with the objective of protecting consumers from unfair and deceptive practices in the debt collection industry.[26]

As alleged in the Complaint, "the Defendants have conspired with and directed their collection agents and debt collectors" to commit violations of the Fair Debt Collections Practices Act. Complaint ¶ 125 (emphasis added). In their Motion to Dismiss, Defendants ignore the basic principles of conspiracy and the Plaintiffs' allegations, based thereon, and instead argue that they themselves are not "debt collectors" and cannot be held liable for the actions of debt collectors under the FDCPA. However, as is well established, "[o]nce a conspiracy is proven, each co-

---

[25] While the focus of the Act is upon the conduct and methods of "debt collectors" collecting debts owed to others, the Act specifically provides for actions against "creditors" in certain circumstances:

> Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.

15 U.S.C. § 1692(a)(6).

Thus, a "creditor" may come within the FDCPA, if it uses a name other than its own which would create the false impression that a third person is collecting the debt. "Creditors" cannot use an attorney's letterhead to give the false impression that the attorney is the collector without violating the FDCPA. See Taylor v. Perrin, Landry, deLaunay & Durand, 103 F.3d 1232, 1236-37 (5th Cir. 1997).

[26] See S. Rep. No. 95-382, at 1-2 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1696.

conspirator is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination."[27]  The major significance of a conspiracy cause of action "lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity."[28]  Defendants' efforts to sterilely distance themselves from the collections and harassment behavior they orchestrate, condone, assist, and benefit from finds no support under the law and should be offered none by this Court.  Defendants' argument, if accepted, would eviscerate this core value of conspiracy claims.  By engaging in their conspiracy with debt collectors to create and collect inflated and deceptive overcharges from uninsured patients, the Defendants and their "debt collectors" acted as co-conspirators and are as fully and mutually liable as if they were a single complicit entity.

11.    Count 12—Section 1983 claim

Defendants attack Count 12 on several grounds.  First, Defendants deny that they can be found "state actors."  This, however, contradicts the claims that non-profit hospitals such as the Defendants for years have been making to the effect that federal and state Medicare/Medicaid and anti-kickback laws required them to charge uninsured patients uniform gross rates.  Complaint ¶¶ 42, 106, 144-149.   The extensively detailed allegations of Count 12 readily state cognizable claims that the Baystate Defendants were a state actor under Section 1983 by virtue of imposing prices upon uninsured patients allegedly compelled by federal and state laws.[29]

---

[27] Carroll v. Timmers Chevrolet, Inc., 592 S.W.2d 922, 926 (Tex. 1979) (emphasis added) (citing State v. Standard Oil Co., 130 Tex. 313, 107 S.W.2d 550, 559 (1937). See also Stuart M. Speiser, et al., The American Law of Torts 3:4, at 386-87 (1983).

[28] Howard v. Superior Court, 3 Cal. Rptr.2d 575, 576 (Ct. App. 1992) (quoting Mox, Inc. v. Woods, 262 P. 302, 303 (Cal. 1927)).

[29] If there were no allegations of state compulsion and violations of equal protection, the Baystate Defendants would continue to argue that their rates for uninsured patients were mandated by federal and state laws.

"State action" may be found when a private hospital bases its challenged policy or practice upon the perceived requirements of law. "When authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respect, to its exercise by Government itself." American Communication Assn. v. Douds, 339 U.S. 382, 401 (1950). See also Sinkins v. Moses Cone Memorial Hosp., 323 F.2d 959, 968 (4th Cir. 1963). The "state action" test is met when the government "significantly encouraged the action alleged to violate the Constitution." Allocco v. City of Coral Gables, F. Supp. 2d 1317 (S.D. Fla. 2002) (quoting Nat'l Broad Co. v. Communications Workers of America, 860 F.2d 1022, 1026 (11th Cir. 1988)). In Doe v. Charleston Area Med. Ctr., 529 F.2d 638 (4th Cir. 1975), it was found that a private non-profit hospital's anti-abortion policy "rest[ed] firmly upon what was thought to be the compulsion of state law." Id. at 644. The president of the hospital testified that the statute was the primary motivation for the policy in question. Id. at 643 n.11. "Thus, the hospital acted under 'color of state law' when it refused to allow its facilities to be used by Doe for an abortion." Id. This case presents the same situation. As alleged in the Complaint, "the Baystate Health Defendants claim that federal and state laws compelled them to charge inflated undiscounted rates for uninsured patients." Complaint ¶ 143 (emphasis added). Thus, the Plaintiff has alleged that the specific federal and state rules at least "motivated" the Defendants acts. See Gerena v. Puerto Rico Legal Services, Inc., 697 F.2d 447, 450 (1st Cir. 1983).[30]

The Defendants' Equal Protection argument similarly fails. A classification based upon

---

[30] Ultimately, whether the Baystate Defendants were acting under color of state law and whether there were specific actions by the government that "motivated" their actions is fact issue that will require significant discovery. Nevertheless, the Plaintiff has properly alleged that the specific acts that motivated the Defendants to charge uninsured patients excessive rates.

indigency is eligible for the heightened scrutiny[31] afforded a suspect class if indigents are "completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit." Edward B. v. Paul, 814 F.2d 52, 56 (1st Cir. 1987) (citing San Antonio School District v. Rodriguez, 411 U.S. 1, 20, (1973)). Here, the Plaintiff has alleged that uninsured patients are unable to pay for a desired benefit, and as a consequence, are charged a higher rate for health care than patients with health insurance. The Supreme Court in Rodriguez did not hold that discrimination based on wealth can never form the basis of a discrimination claim; rather the Court noted that "wealth discrimination alone" had not been recognized as invoking strict scrutiny, and the appellees accordingly had not relied "solely on this contention." San Antonio School District v. Rodriguez, 411 U.S. 1, 29 (1973). Plaintiff does not rely on this contention either. Finally, the Court in Rodriguez found that the appellees had a classification problem, noting that there was "no definitive description of the classifying facts or delineation of the disfavored class." Id. at 19. In this case, the Plaintiff has alleged a specific delineation of the disfavored class — uninsured patients.

---

[31] Even without strict scrutiny or heightened scrutiny, Defendants' conduct fails to survive the scrutiny of a rational basis review. As is pleaded, Defendants' conduct is actually antithetical to any legitimate government interest underlying 501(c)(3) as applied to hospitals – which is a statute intended to facilitate, not hinder, the acquisition of basic health care for uninsured and indigent patients. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432 (1985).

## III.  CONCLUSION

For the foregoing reasons, the Baystate Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

DIANE HARRINGTON, On Behalf of Herself and All
Others Similarly Situated
By her Attorneys,

**Dated: September 23, 2004**

_____

Thomas M. Greene, Esq. (BBO#210020)
Ilyas J. Rona, Esq. (BBO#642964)
Greene & Hoffman, P.C.
125 Summer Street, Suite 1410
Boston, MA 02110
Tel: (617) 261-0040
Fax: (617) 261-3558

CO-COUNSEL:

John W. Crongeyer, GA Bar No. 197267
Bryan A. Vroon, GA Bar No. 7298086
Vroon & Crongeyer, LLP
1230 Peachtree Street, Suite 2450
Atlanta, Georgia  30309
Telephone: (404) 607-6710
Facsimile:  (404) 607-6711

Keith M. Fleischman, KF-0199
Ronald J. Aranoff, RA-4690
Bernstein Liebhard & Lifshitz, LLP
10 East 40th Street, 22nd Floor
New York, NY  10016
Telephone: (212) 799-1414
Facsimile: (212) 799-3218

Don Barrett, Esq.
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, Mississippi 39095
(662) 834-2376

## CERTIFICATE OF SERVICE

I, Ilyas J. Rona, hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first-class mail, postage pre-paid, and facsimile on September 16, 2004.

_____

Ilyas J. Rona