IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RHONDA KIZZIRE, et al., | ] |
| Plaintiffs, | ] |
| v. | ] CASE NO.: CV-04-HS-1247-S |
| BAPTIST HEALTH SYSTEM, INC., | ] |
| Defendant. | ] |

## Memorandum of Opinion

**ENTERED OCT 2 1 2004**

### I.   INTRODUCTION

This is a civil action, filed on June 16, 2004, by the Plaintiff, Rhonda Kizzire, on behalf of herself and others similarly situated, against the Defendant, Baptist Health System, Inc. (doc. 1). On July 7, 2004, the Plaintiff filed her First Amended Class Action Complaint (doc. 6), adding as Plaintiffs Larry Calvin Martin and Michael R. Dennis. Finally, the Plaintiff filed a Second Amended Complaint on August 2, 2004 (doc. 11), adding as Defendant American Hospital Association.

The Second Amended Complaint alleges

Baptist Health System, Inc. ("BHS") is the largest health care system in Alabama and one of the state's largest employers. BHS is a not-for-profit, 501(c) charitable, tax-exempt corporation that owns and manages hospitals and health-related facilities in the state of Alabama. Defendant BHS has operated free from federal and state taxes because it promised the government that it would operate as a charity provider of health care for the uninsured and that it would not engage in business directly or indirectly, for the benefit of private interests. In reality, BHS does just the opposite: it charges its uninsured patients significantly more than those who have insurance, generally pursuing the poor or uninsured relentlessly by aggressive and humiliating collection techniques; and through either "connected" board members and/or physicians whose for-profit businesses are favored and subsidized by the "tax-free" organization, are rampantly violating the federal and state prohibition against profiteering by "private interests."

>BHS and its confederates who employ the same business model have thereby amassed and hoarded hundreds of millions of dollars in cash and marketable securities, which otherwise should be available to provide charity care to the uninsured who were contemplated by the tax exemption. Moreover, enormous property and revenues have been insulated from taxation, the effect of which has bestowed upon Defendant BHS and its confederates greater liquidity than that possessed by most state and local governments.
>
>The American Hospital Association is the national trade association for the nonprofit hospital industry, and serves as the representative for Defendant BHS. The American Hospital Association has conspired with, and aids and abets BHS and its other nonprofit hospital members in carrying out their unfair, discriminatory, unconscionable and oppressive business practices.

*Second Amended Complaint*, at 1. It alleges the following Counts: (1) Third Party Breach of Contract (Count One); Breach of Contract (Count Two); Breach of Duty of Good Faith and Fair Dealing (Count Three); Breach of Charitable Trust (Count Four); Violations of the Emergency Medical Treatment and Active Labor Act (Count Five); Unjust Enrichment/Constructive Trust (Count Six); Civil Conspiracy/Concert of Action (Count Seven); Aiding and Abetting (Count Eight); and a Count for Injunctive/Declaratory Relief (Count Nine).

Presently before the Court is Defendant Baptist Health System, Inc's Motion to Dismiss on Res Judicata Grounds (doc. 19); Defendant Baptist Health System, Inc's Motion to Dismiss (doc. 21); and Defendant American Hospital Association's Motion to Dismiss (doc. 32). For the reasons stated in this memorandum, the motions will be **GRANTED**.

## II.    STANDARD OF REVIEW

Because matters outside the pleadings[1] have been considered by the Court and not specifically excluded in rendering its decision, the parties and this Court have treated these motions as converted to Motions for Summary Judgment pursuant to Fed. R. Civ. P. 12(b).

---

[1] Specifically, the State Court Complaints filed by the Defendant.

> In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir. 2004).

### III. GENERAL ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

The following allegations are, under Lofton, accepted as having been established.

The Second Amended Complaint alleges the following:

8. Defendant BHS represents itself as an Alabama based, tax exempt, charitable, nonprofit hospital system. BHS is a ministry of the churches of the Birmingham Baptist Association whose representatives elect BHS's Board of Trustees. It was founded in 1922 by a group of local Baptist congregations.

9. Defendant BHS is the largest healthcare provider in Alabama maintaining 10 hospitals in Alabama, including Baptist Medical Center Shelby County.

10. Defendant BHS is also one of the most financially successful hospital systems in the Alabama. In 2001, BHS generated approximately $580 million in revenue and has total assets valued at over $623 million.

11. Defendant BHS entered into express and/or implied Agreements with the United States Government and the State of Alabama, Jefferson, Shelby, Dekalb, Cherokee, Talladega, Cullman, Walker and Lawrence Counties to provide mutually affordable medical care to all of its patients in return for substantial tax exemptions. An express and/or implied contractual relationship was thereby created between Defendant BHS and the United States Government and the State of Alabama, Jefferson, Shelby, Dekalb, Cherokee, Talladega, Cullman, Walker and Lawrence Counties to accomplish such purpose. Defendant BHS's uninsured and medically indigent patients during the period between June 16, 1994 and June 16, 2004 were the express and/or implied intended third party beneficiaries of such Agreements.

12.  Defendant BHS receives a federal income tax exemption as a purported "charitable" institution under 26 U.S.C. §501(c)(3). Under §501(c)(3), Defendant BHS is required to operate "exclusively" in furtherance of a charitable purpose, with no part of its operations attributable directly or indirectly to any noncharitable commercial purpose and with no part of its earnings inuring to the benefit of any private individual or entity. By accepting this favorable tax exemption, Defendant BHS explicitly and/or implicitly agreed: to operate exclusively for charitable purposes; to provide an emergency room open to all of its uninsured patients without regard to their ability to pay for such care; to provide mutually affordable medical care to all of its uninsured patients; not to charge its uninsured patients the highest and full undiscounted cost for medical care; not to charge its uninsured patients a higher rate for medical care than its insured patients; to use its net assets and revenues to provide mutually affordable medical care to its uninsured patients; and not to pursue outstanding medical debt from its uninsured patients through humiliating collection efforts, lawsuits, liens and garnishments.

13.  Defendant BHS also receives state and local income, property and sales tax exemptions from the State of Alabama under Ala. Code § 40-23-5. Under § 40-23-5, in order for a nonprofit hospital to be exempt from taxation it must not operate for pecuniary gain or individual profit. By accepting these favorable state and local tax exemptions, Defendant BHS explicitly and/or implicitly agreed: to operate exclusively for charitable purposes; to provide mutually affordable medical care to all of its uninsured patients; not to charge its uninsured patients the highest and full undiscounted cost of medical care; not to charge its uninsured patients a higher rate for medical care than its insured patients; to use its net assets and revenues to provide mutually affordable medical care to its uninsured patients; and not to pursue outstanding medical debt from its uninsured patients through humiliating collection efforts, lawsuits, liens and garnishments.

14.  Despite its favorable tax exempt status and its substantial net revenues and asset reserves in the hundreds of millions of dollars, Defendant BHS has breached its Agreements with the United States Government, the State of Alabama, and Jefferson, Shelby, Dekalb, Cherokee, Talladega, Cullman, Walker and Lawrence Counties by failing to provide emergency room medical care to its uninsured patients without regard to their ability to pay for such care; charging its uninsured patients the highest and full undiscounted cost for medical care at grossly inflated rates from the actual cost of providing such services; allowing noncharitable for-profit physician groups and service providers to derive profit from its tax exempt hospitals; by engaging in aggressive efforts to collect such medical debt from its uninsured patients through abusive, harassing, and humiliating collection lawsuits, liens, and garnishments; and upon information and belief providing discounted medical care to its Board of Directors and entities connected to its Board of Directors. Defendant BHS's uninsured patients have therefore not received the benefit of the Agreements

4

between Defendant BHS and the United States Government, the State of Alabama and Jefferson, Shelby, Dekalb, Cherokee, Talladega, Cullman, Walker and Lawrence Counties. These uninsured patients primarily consist of the working class who do not qualify for Medicaid or charity care but cannot afford private health insurance and/or cannot obtain health insurance through their employers.

15.  Defendant BHS sets its charges for medical services at highly inflated rates that bear no connection to the actual cost of providing the service. While Defendant BHS gives private insurance companies and governmental third party payors like Medicare and Medicaid large discounts off this gross or "sticker price," all of its uninsured patients are charged 100% of the full sticker price, which can be as large as twice as much charged to the insured for the same service. Defendant BHS realizes substantial revenues from this discriminatory charging practice. Defendant BHS also realizes the highest profit per discharge on its uninsured patients who pay such grossly inflated prices.

16.  Despite sizeable net revenues and its asset reserves in the hundreds of millions of dollars, Defendant BHS provides little to no charity care to its uninsured patients. Defendant BHS's level of charity care constitutes only a small amount of its gross charges. Defendant BHS has never provided an amount of uncompensated care equal to its market share.

17.  In addition, Defendant BHS uses Enron-style accounting tricks to grossly distort the small amount of charity care it does provide to insured patients. Defendant BHS reports is amount of charity care as the amount of gross charges-which are grossly inflated-rather than the cost of actually providing the service. Defendant BHS further exaggerates the amount of charity care that it does by simply referring to all bad-debt writes offs as charity care.

18.  Before Defendant BHS admits any patient, including its uninsured patients, into its hospitals and/or emergency rooms for medical care, it requires its patients to sign a form contract promising to pay Defendant BHS in full for unspecified and undocumented charges for medical care that are set by Defendant BHS in its sole discretion.

19.  Not only does Defendant BHS charge its uninsured patients the highest rates for medical care, which they cannot afford to pay, it has also engaged in the uniform pattern and practice of aggressively pursuing such debt through abusive, humiliating, and harassing collection efforts, such as collection lawsuits, liens, and garnishments. Such lawsuits have driven many BHS patients, including Plaintiffs, to bankruptcy and/or financial ruin.

20.  Upon information and belief, while Defendant BHS charges its

5

uninsured patients the full undiscounted cost for medical care, its provides substantial discounts off the gross charges to its Board of Directors and entities owned, controlled or connected to its Board of Directors. These discounts are in direct violation of Defendant BHS's obligations under 26 U.S.C. § 501(c)(3); Ala. Code §§ 10-3A-1 et seq; 40-23-5.

21.  Defendant BHS also allows numerous outside for-profit physician groups and service providers to use its tax-exempt hospitals to derive a profit. These for-profit physician groups and service providers practice in BHS's taxpayer subsidized hospitals and then bill patients for work done at these tax-exempt hospitals. These for-profit physician groups and service providers are non-charitable entities which do not have a charitable mission or purpose. By allowing noncharitable for-profit entities with no charitable mission to derive a profit from its charitable tax-exempt hospitals, Defendant BHS has not operated actually and exclusively for charitable purposes in violation of its obligations under 26 U.S.C. §501(c)(3), and Ala. Code §§ 10-3A-1 et seq.; 40-23-5.

22.  The Defendant American Hospital Association ("AHA"), is the national trade association for the nonprofit hospital industry, and serves as the representative for Defendant BHS and its nonprofit hospital members. According to its website, the AHA "ensures that members' perspectives and needs are heard and addressed in national health policy development, legislative and regulatory debates, and judicial matters."

23.  AHA, through internal memos called "white papers" and other publications, provides substantial assistance and guidance to BHS and the nonprofit hospital industry on its billing and collection practices for uninsured patients, including publications such as "Seven Strategies to Improve Your Bottom Line". In these publications, the AHA encourages BHS and its other nonprofit hospital members to inflate its chargemaster prices, which only BHS' uninsured patients are charged. These inflated chargemaster prices have the intended effect of increasing BHS' outlier payment reimbursements under the Disproportionate Share Hospital (DSH) and Medicare reimbursement programs.

24.  On December 17, 2003, the AHA sent out a "white paper" entitled "Federal Regulations Hamper Hospitals' Efforts to Assist Patients of Limited Means" to BHS and its member nonprofit hospitals, which falsely advised such hospitals that the Medicare laws and regulations prevented them from offering discounts to uninsured patients and required them to aggressively collect medical debt from the uninsured through collection lawsuits, liens, and garnishments.

25.  The AHA actively conceals from, and misrepresents to, the government and regulatory agencies the amount of charity care provided by BHS and

6

its nonprofit hospitals to the uninsured. According to a June 21, 2004, article in Modern Healthcare entitled "Well Kept Secret", "the AHA collects charity care data [from its members] in its annual hospital survey but does not report the total. Instead, it reports uncompensated care which includes bad debt as well as charity care."

26.    The AHA also falsely justifies to the public and governmental entities the reasoning for the outrageous billing and collection practices employed by BHS and its nonprofit hospital members. In a December 16, 2003, letter to the United States Department of Health and Human Services Secretary Tommy Thompson, the AHA, while admitting that BHS and its nonprofit hospital members charge its uninsured patients the full price for medical care, falsely represented to the Secretary that BHS and its member nonprofit hospitals were required by the federal Medicare regulations to charge and aggressively collect such grossly inflated medical expenses.

27.    On February 19, 2004, Secretary Thompson, as the ultimate governmental authority on the applicable Medicare regulations, exposed the falsity of the AHA's prior advice and representations, stating that the Medicare regulations have never required nonprofit hospitals to charge its uninsured patients the highest price for medical care nor prevented such hospitals from offering discounts to its uninsured patients. Moreover, on June 24, 2004, in testimony before the House of Representatives Energy and Commerce Subcommittee on Oversight and Investigations, the Director of the Center for Medicare and Medicaid Services testified that Medicare billing requirements did not prevent discounting medical care to uninsured patients and did not require aggressive collection efforts toward the uninsured. Similar testimony was provided by the Chief Counsel of the Office of Inspector General of the Department of Health and Human Services, who testified that the federal regulations were clear and that there was no justification for interpreting such regulations as preventing discounts to the uninsured.

V.

## PLAINTIFFS

**Rhonda Kizzire**

28.    Plaintiff Rhonda Kizzire is a single, working mother of two children, and during the period of 1999 through 2002, she was uninsured.

29.    On numerous occasions between May 1999 and May 2002, Plaintiff Kizzire sought medical treatment and care at Baptist Medical Center-Shelby (a BHS hospital located in Shelby County, Alabama) on behalf of her children and herself.

7

Many of these visits were prompted by medical emergencies.

30.   Instead of rendering charity care to Plaintiff Kizzire and her children, Defendant BHS charged Plaintiff Kizzire a rate for their medical care and treatment that far exceeded the actual cost of providing the care and treatment. Unable to pay this inflated rate, Defendant BHS sued Plaintiff Kizzire for the unpaid medical bills on or about December 4, 2003. A judgment in the amount of $12,641.12 was entered in the favor of BHS in January 2004. BHS now garnishes the low-income wages of Plaintiff Kizzire in an effort to seek repayment for the medical care and treatment rendered at Baptist Medical Center-Shelby.

31.   Defendant BHS's refusal to grant Plaintiff Kizzire and her children charitable medical care, along with BHS's lawsuit and garnishment of her wages, has left Plaintiff Kizzire in an untenable financial position teetering on the brink of ruin.

**Larry Calvin Martin**

32.   Plaintiff Larry Calvin Martin is an adult resident citizen of Jefferson County, Alabama residing at 1704 Elkwood Drive, Fultondale, Alabama. Plaintiff Martin is a married, self-employed father of two who became uninsured on or about 2001 after his wife lost her job.

33.   On or about March 30, 2002, Plaintiff Martin sought emergency medical treatment and care at Baptist Medical Center-Princeton (a BHS hospital located in Birmingham, Alabama) after suffering a stroke. Upon admittance to the emergency room Plaintiff Martin's wife told the admitting clerk that her husband was uninsured and asked that he be transferred to Cooper Green after he was stabilized. The admitting clerk by telling Mrs. Martin "not to worry about that." The next day, Mrs. Martin told Plaintiff's physician that he was uninsured and asked that he be transferred to Cooper Green hospital after stabilization. Once again Mrs. Martin was told "not to worry about that." Despite Mrs. Martin's request, Plaintiff Martin was never transferred to Cooper Green and was hospitalized for four days. For these four days Plaintiff was charged approximately $21,126.00. After leaving BMC-Princeton, Plaintiff was transferred to Lakeshore Rehabilitation Hospital where he spent approximately three weeks undergoing physical rehabiliation.

34.   Lakeshore Rehabilitation hospital, a for-profit hospital owned and operated by Healthsouth provided Plaintiff Martin with charity care for his stay after learning he was uninsured. In contrast, Defendant BHS, a nonprofit and purported "charitable institution," not only failed to render charity care to Plaintiff Martin but charged Martin a rate for his medical care and treatment that far exceeded the actual

8

cost of providing the care and treatment.

35. Unable to pay this inflated rate, Plaintiff Martin began receiving collection letters and bills almost immediately after his release from the hospital. Martin attempted to work out a "fair and reasonable" payment plan but Defendant BHS refused. Despite Plaintiff Martin's good faith attempt to pay his medical bills by paying approximately $100 per month, on or about October 2003 a representative of Defendant BHS, along with a Jefferson County Deputy Sheriff, came to Plaintiff Martin's home after filing suit against him and threatened to garnish his wages and place a lien on his home if he did not agree to a predatory repayment schedule.

36. Defendant BHS's refusal to grant Plaintiff Martin charitable medical care, along with BHS's lawsuit and threat of garnishment and a lien, has left Plaintiff Martin in an untenable financial position teetering on the brink of ruin.

**Michael R. Dennis**

37. Plaintiff Michael R. Dennis is a small business owner and father of three. Plaintiff Dennis became uninsured on or about 2001 after he was denied health insurance after purchasing a small convenience store and beauty salon.

38. In 2002, Plaintiff Dennis sought emergency treatment at BMC-Shelby after suffering chest pains. Plaintiff Dennis was treated and released but was still charged approximately $13,000 by BMC-Shelby.

39. Instead of rendering charity care to Plaintiff Dennis, Defendant BHS charged Dennis a rate for his medical care and treatment that far exceeded the actual cost of providing the care and treatment. Unable to pay this inflated rate, Defendant BHS sued Plaintiff on January 2, 2003 for the unpaid medical bills. A judgment was entered in the favor of BHS for $13,426.57. BHS then garnished a Certificate of Deposit that Plaintiff Dennis had with National Bank of Commerce. This CD was essentially Plaintiff Dennis' entire savings.

40. Defendant BHS's refusal to grant Dennis charitable medical care, along with BHS's lawsuit and garnishment of his Certificate of Deposit, has left Plaintiff Dennis in an untenable financial position teetering on the brink of ruin.

*Second Amended Complaint*, at 8-13.

IV. **DISCUSSION**

    A. **Res Judicata**

9

The Defendants contend that the Motion should be granted because the doctrine of res judicata bars the instant action. Under this Circuit's *res judicata* procedure, when a federal court exercises federal question jurisdiction and "is asked to give *res judicata* effect to a state court judgment, it must apply the *res judicata* principles of the law of the state whose decision is set up as a bar to further litigation." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1509 (11th Cir. 1985). Under Alabama law, "the essential elements of res judicata are (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of parties, and (4) with the same cause of action presented in both suits." *Wesch v. Folsom*, 6 F.3d 1465, 1471 (11th Cir. 1993); *Equity Res. Mgmt., Inc. v. Vinson*, 723 So.2d. 634, 636 (Ala. 1998).

The Plaintiffs agree that the first three elements apply as to all claims. The question then becomes, is the action asserted in state court the same as the causes of action asserted in this action.

The one-page form fill-in-the-blank "Complaint" that BHS filed against Plaintiff Kizzire, and upon which BHS obtained a default judgment, stated as the cause of action, in full:

> I claim that the defendant <u>Rhonda D Kizzire</u> owes the plaintiff the sum of <u>$8,954.87</u> because: <u>Contract Work & Labor,</u> plus $ <u>6%</u> for interest plus $<u>3018.78</u> for lawyer's fees (only if plaintiff is represented by a licensed attorney and if the contract you signed so provides), less remittitur for any payments made and with waiver of exemptions, if the contract you signed so provides.

(Attached as Exhibit A-43 in BHS' Brief In Supp.). A similar one-page form "Complaint" was filed by BHS against Plaintiffs Larry Martin and Michael Dennis. (Attached as Exhibits B-8 and C-23, respectively, in BHS' Brief in Supp.)

The Alabama Supreme Court has stated:

> The application of the doctrine of *res judicata* to identical causes of action is not dependent on the identity or differences in the forms of the two actions, although such differences may be considered. If a claim, which arises out of a single wrongful

10

act or dispute, is brought to a final conclusion on the merits, then all other claims arising out of that same wrongful act or dispute are barred, even if those claims are based on different legal theories or seek a different form of damages, unless the evidence necessary to establish the elements of the alternative theories varies materially from the evidence necessary for a recovery in the first action.

*Equity Resources Management, Inc. v. Vinson,* 723 So.2d 634, 638 (Ala.,1998).

Plaintiffs' claims here are not the same as Defendants' claims in the state court (collection) actions. The state court actions sought judgment for the BHS medical services. Having said that, BHS would have had to prove that the services were provided to each Plaintiff herein and that the charged were owed. The fact that whatever claims the Plaintiffs might have had regarding the reasonableness of BHS's charges were not actually asserted in the prior actions makes no difference. Under Rule 13(a), Ala. R. Civ. P., a compulsory counterclaim "shall" be asserted "against any opposing party." Therefore, "[a] counterclaim is compulsory if there is any *logical relation of any sort* between the original claim and the counterclaim." *Ex parte Water Works & Sewer Bd. of Birmingham,* 738 So.2d 783, 789 (Ala. 1998).

> "The logical relationship test denominates a counterclaim as compulsory if (1) its trial in the original action would avoid substantial duplication of effort or (2) the original claim and the counterclaim arose out of the same aggregate core of operative facts. The claims arise from the same core of operative facts if (1) the facts taken as a whole serve as the basis for both claims or (2) the sum total of facts upon which the original claim rests creates legal rights in a party which would otherwise remain dormant."
> (Emphasis added.) This Court has further stated that " '[t]he rule on compulsory counterclaims should receive a "broad realistic interpretation in light of the interest of avoiding a multiplicity of suits." ' " *Mississippi Valley Title Ins. Co. v. Hardy,* 541 So.2d 1057, 1060 (Ala.1989) (quoting *Plant v. Blazer Fin. Services, Inc. of Georgia,* 598 F.2d 1357, 1361 (5th Cir.1979)) (quoting 3 Moore's Federal Practice ¶ 13.13 at p. 300).

*Ex parte Water Works and Sewer Board of City of Birmingham,* 738 So.2d 783, *789 (Ala.,1998).

The claims the Plaintiffs now assert were compulsory counterclaims which were required to

11

be asserted in the first actions. The failure to assert those claims means they are now barred.

In reaching this conclusion, the Court is bound by the holding in *Reed v. Brookwood Medical Center*. In that case, Reed went to Brookwood Medical Center for treatment. *Reed v. Brookwood Med. Ctr.*, 641 So.2d 1245, 1246 (Ala. 1994). Upon admission, he signed a contract agreeing to be personally responsible for the cost of all medical treatment. *Id.* After treatment and discharge, he received a bill for those medical services, which he did not pay. *Id.* Brookwood sued Reed, and a final judgment for the charges was entered in Brookwood's favor. *Id.* After that judgment was final, Reed sued Brookwood for breach of contract, outrage, and defamation, "based on the contention that Brookwood had wrongfully sued him . . . to collect its bill." *Id.* In determining that the second action filed in Morgan Circuit Court was barred, the Supreme Court stated:

> A court of competent jurisdiction determined that Reed was personally liable to Brookwood for the medical treatment he received in December 1990. Therefore, Reed's claims in the present action are barred because, in order to resolve them, the Morgan Circuit Court would have to find that Reed did not owe this same debt to Brookwood, even though the Morgan District Court has previously found him personally liable for it and has rendered a judgment against him based on that debt.

*Id.*, 641 So.2d at 1247. Similarly, in order to resolve the present claims, this Court would have to find that these Plaintiffs did not owe the debt to the hospital–an issue previously litigated and decided in the state court.

Plaintiff contends that the "same evidence" test demonstrates that the two causes of action are different. Specifically, they write that at the state court level "Plaintiffs did not and could not be aware of, and what thus could not have been litigated in the collection actions, was the fact that BHS was obligated by its contract with the U.S. to provide charity care to them." However, whether charity care should have been provided goes to the very heart of how much, if anything, each

12

Plaintiff would have owed on the bills presented to them. The same evidence that should have been used to establish this defense in the state court would be used by this Court to establish both the debt and the obligation thereon.

The doctrine of *res judicata* bars all Counts in this case as to all Defendants, except the EMTALA count.[2] The Motion to Dismiss will be **GRANTED** as to each of these Counts and all Defendants.

### B. Plaintiffs' claim under the Emergency Medical Treatment and Labor Act ("EMTALA")

EMTALA, requires hospitals to: (1) provide the patient with an appropriate medical screening; and (2) stabilize the patient's condition or arrange for an appropriate transfer to another facility. 42 U.S.C. §§ 1395dd(a), (b). In addition, EMTALA prohibits a hospital from delaying medical screening or treatment in order to inquire about the individual's method of payment or insurance status. 42 U.S.C. § 1395dd(h). "[T]his language only requires a hospital to provide indigent patients with a medical screening similar to one which they would provide any other patient." *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994) ("As the district court noted, no evidence suggests that Humana treated Ms. Smith differently from other patients. Thus, Humana was entitled to summary judgment on the section 1395dd(a) claim.") (citation omitted). Plaintiffs do not allege that they failed to receive an appropriate screening, or that they were screened differently than other patients. To the contrary, plaintiffs admit that they received treatment for their conditions and were subsequently either released or transferred. Plaintiffs' allegations do not support a claim under Section 1395dd(a).

---

[2] The Plaintiff agreed at oral argument that if all other counts were disposed of by a Motion to Dismiss, then Counts Seven, Eight, and Nine, would also be properly dismissed.

13

EMTALA also requires that if, after an appropriate screening, a hospital determines that a person suffers from an "emergency medical condition," it then must provide whatever treatment within its capabilities is needed to stabilize the condition before discharging the patient. *Gardner v. Elmore Comty. Hosp.*, 64 F. Supp. 2d 1195, 1204 (M.D. Ala. 1999). Therefore, a viable Section 1395dd(b) claim requires plaintiffs to plead that: (1) they had an emergency medical condition; (2) the hospital knew of the condition; and (3) the patient was not stabilized before being discharged or transferred. *Id.* There is no allegation in the complaint that this section was violated.

Section 1395dd(d)(2)(A) is the only EMTALA provision that allows for enforcement by an individual, private plaintiff. *Holcomb v. Humana Hosp.-Montgomery*, 807 F. Supp. 1526, 1530 (M.D. Ala. 1992). Under Section 1395dd(d)(2)(A), an individual who suffers personal harm resulting from a hospital's violation of EMTALA may, in a civil action, "obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." The Supreme Court of Alabama has noted that personal injury encompasses mental and/or emotional distress and bodily harm. *Ex parte Graham*, 634 So.2d 994, 997 (Ala. 1993). Thus, in deciding whether plaintiff had a compensable injury under EMTALA, the district court looked at whether the plaintiff suffered physical harm in *Zeigler v. Elmore County Health Care Auth.*, 56 F. Supp. 2d 1324, 1327 (M.D. Ala. 1999). The court concluded that the plaintiff could recover under Section 1395dd(d)(2)(A) because plaintiff suffered physical harm as a result of the delay in treatment. *Id.* Plaintiffs allege that violations of 42 U.S.C. § 1395dd have caused them "economic injury and other damages." Even assuming that plaintiffs have adequately pleaded a cause of action under Section 1395dd, which they have not, economic injuries are not "personal injuries" under Alabama law and thus not compensable damages under the civil

14

enforcement provision of EMTALA.

Lastly, even if the Plaintiff has properly pled an EMTALA case, pursuant to Section 1395dd (d)(2)(C), a civil action under EMTALA must be brought within two years after the date of the alleged violation. Any alleged EMTALA violations would necessarily have had to occur at the time of treatment. This action was filed well after the last date of treatment by any of the Plaintiffs. Accordingly, the action is time barred. Plaintiffs' claim that their EMTALA claims are not time barred because BHS's EMTALA violations against the Plaintiffs are ongoing because of continued collection efforts, suits, etc. The law is clear however, that the violation centers around treatment, or the lack thereof at the time the patient appears at the hospital. There is no support for the proposition that continued collection efforts could somehow toll the period for the running of the statute of limitations. The EMTALA claims are due to be **DISMISSED**.

DONE this __2Y__ day of October, 2004.

                                                  VIRGINIA EMERSON HOPKINS
                                                UNITED STATES DISTRICT JUDGE