IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| KATIE M. WASHINGTON, individually and on behalf of TERRELL WASHINGTON, a minor, CYNTHIA WILLIAMS, STEPHANIE DANIEL, WILLIE CLAY, SUSAN and RICHARD SMITH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 5:04-cv-185 (CAR) |
| v. | ) ) | |
| MEDICAL CENTER OF CENTRAL GEORGIA, INC., CENTRAL GEORGIA HEALTH SYSTEMS, INC. MEDCEN COMMUNITY HEALTH FOUNDATION, INC., AMERICAN HOSPITAL ASSOCIATION and JOHN DOES 1THROUGH 10, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

*ORDER ON DEFENDANT'S MOTION TO DISMISS*

This case is before the Court on the Motion to Dismiss by Defendants Medical Center of

Central Georgia, Inc. and Central Georgia Health Systems, Inc. (collectively "the Medical Center")

and by Defendant American Hospital Association ("AHA"). Plaintiffs in this case challenge the

Medical Center's policies for billing and collections from uninsured and indigent patients, and

specifically allege that the Medical Center charges inflated rates to uninsured patients and uses

excessively aggressive tactics to collect on unpaid bills. Upon review of the allegations of the

Complaint, the arguments of counsel, and the relevant legal authorities, the Court finds that with

regard to Counts One, Four, Six, Seven, Eleven, and Twelve, the Complaint fails to set forth a cause

1

of action upon which relief can be granted. Accordingly, those Counts are dismissed, with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The remaining substantive Counts, Two, Three, and Five, are state law Counts before the Court pursuant only to its supplemental jurisdiction under 28 U.S.C. § 1367, and the Court declines to exercise any remaining supplemental jurisdiction over those claims. They are dismissed without prejudice. Counts Eight, Nine, and Ten are dismissed with prejudice to the extent that they set forth claims of conspiracy or for equitable relief pursuant to federal law, without prejudice to any actual or potential claims under state law.

In assessing the present Motion to Dismiss, the Court accepts as true all material facts alleged in the Complaint and construes all reasonable inferences in the light most favorable to Plaintiffs. *See* Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999) (per curiam). Dismissal is appropriate under Rule 12(b)(6) only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

The Complaint in this case alleges that the Medical Center is a not-for-profit corporation that operates a hospital in the City of Macon, Georgia. As a non-profit hospital, the Medical Center enjoys exemption from federal tax obligations pursuant to 26 U.S.C. § 501(c)(3). Plaintiffs allege that they were uninsured patients of the Medical Center who sought and received treatment at the Medical Center's emergency room. Prior to receiving that treatment, Plaintiffs were required to sign consent-to-treatment forms that included a consent to any services deemed necessary for treatment and a guarantee to pay all charges billed for such services. At the time of signing these forms, Plaintiffs were not aware of the services that would be deemed necessary and were not aware of the

2

fees that would be charged for those services. The agreement therefore vested substantial discretion in the Medical Center as to the extent and cost of any services.

Plaintiffs contend that the Medical Center charged uninsured patients "grossly inflated" fees for its services, fees substantially higher than those it charges private and government insurers for the same services.[1] When Plaintiffs were unable to pay, the Medical Center pursued aggressive collection efforts, including harassing letters and phone calls. Ultimately, the Medical Center filed complaints against Plaintiffs in magistrate courts of the State of Georgia and obtained default judgments and garnishment orders for the collection of the unpaid bills. Plaintiffs bring the current case as a proposed class action, seeking to represent all uninsured patients who obtained treatment at the Medical Center. Plaintiffs propose a number of legal theories to provide the basis for a cause of action for this alleged injustice.

Plaintiffs' foremost legal theories relate to the Medical Center's tax exempt status under Section 501(c)(3). In Count One of the Complaint, Plaintiffs contend that the 501(c)(3) tax exemption constitutes a contract between the Medical Center and the federal government, under which the Medical Center receives the benefit of tax exemption in exchange for accepting the obligation to function as a charitable institution. Plaintiffs further contend that they are third-party beneficiaries of the contract and that the Medical Center breached its obligations to them by failing to provide an adequate level of charitable care to indigent patients, and specifically by charging inflated rates for uninsured patients. Count Four of the Complaint alleges that the 501(c)(3) tax

---

[1]Contrary to the Medical Center's characterization of the Complaint, Plaintiffs do not merely contend that the Medical Center charged a "regular" rate for uninsured patients and a discounted rate for insurance carriers and government payers, but rather contend that the charges for uninsured patients were inflated well above any reasonable fee for the services. On a motion to dismiss, the Court must accept the allegations of the Complaint as true.

exemption creates a charitable trust, with indigent patients as beneficiaries, and that the Medical Center breached its duties as trustee of that trust.

Plaintiffs' Section 501(c)(3) theories, set forth in Counts One and Four of the Complaint, fail to state a claim for which relief can be granted. The tax exemption provisions of Section 501(c)(3) create neither a contractual relationship between the Government and the Medical Center nor an express or implied charitable trust. Plaintiffs' contract and trust arguments in essence are an attempt by a private party to enforce its interpretation of the tax code as it relates to another private party. The Internal Revenue Code permits no such private right of action to enforce the provisions of Section 501(c)(3). The right of enforcement is reserved exclusively to the Department of the Treasury.

The Government's recognition of the Medical Center's tax-exempt status under Section 501(c)(3) cannot be construed as a contract between the Government and the Medical Center. Only in rare circumstances may a statute be construed as a contract between the Government and any persons or entities to whom the statute applies. The United States Supreme Court has long maintained that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" Nat'l R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co., 470 U.S. 451, 465-66 (1985)(quoting Dodge v. Board of Education, 302 U.S. 74, 79 (1937)). To construe statutes as contracts, the Court explained in National Railroad, would be to limit severely the essential powers of a legislative body by hampering its ability to revise and repeal the policies set forth in the laws. Therefore, a statute may be construed as a contract only where the language of the statute or the circumstances of its passage

4

clearly express an actual intent by the Government to bind itself to a particular party in a contractual relationship.[2]

There are no such circumstances and no such statutory language in relation to Section 501(c)(3). Section 501(c)(3) does not establish a relationship between the United States and any identifiable party, but rather sets forth standards of general application by which it can be determined whether any party or entity may be subject to taxation or exempt from taxation. Nothing in the statute indicates that Congress has restricted in any way its usual ability to repeal or revise the statute in any way at any time. Thus, Congress might tomorrow revoke the tax exemption or revise it so that it no longer applies to non-profit hospitals, and the Medical Center will have no cause of action for breach of contract. There is no indication from the statute that Congress has bargained away its power to tax non-profit hospitals or any other entities currently exempt under Section 501(c)(3). Section 501(c)(3) is a legislative enactment of policy subject to revision at any time, and cannot be construed as a contract.

The contrast between this case and the cases under the Hill-Burton Act to which Plaintiffs analogize is instructive. The Hill-Burton Act, at 42 U.S.C. § 291, *et seq.*, provides for the

_____

[2]Examples of legislative actions that constitute contracts include: a tax exemption attached to the issuance of certain bonds (*see* Hale v. Iowa State Board of Assessment and Review, 302 U.S. 95 (1937)); a tax immunity granted in the charter of a state-chartered railroad (*see* Atlantic Coast Line R. Co. v. Phillips, 332 U.S. 168 (1947)); and a covenant between two states limiting the ability of the states' joint Port Authority to subsidize passenger rail service from its revenues (*see* U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1 (1977)). In each of these cases, the legislature entered into a discrete transaction with an identifiable party for a specific purpose. The legislature's subsequent ability to repeal the statute was limited by the Contracts Clause of the United States Constitution. Because of the limits that such contracts place on legislative power, there is a strong presumption against the construction of a statute as creating a contract, and courts will only construe a law as a contract where the obligation is "clearly and unequivocally expressed." Nat'l R.R. Passenger Corp., 470 U.S. at 466.

5

disbursement of federal funds to subsidize private hospital construction. Each payment of funds to each individual recipient requires a discrete written contract and creates a direct contractual relationship between a Government agency and the particular entity receiving those funds. The purpose of the contractual relationship is specific and well-defined. In return for the receipt of such funds, hospitals must assure that they will provide a "reasonable volume" of services to persons unable to pay. Pursuant to the Act, the Secretary of Health and Human Services has promulgated a series of regulations to define and enforce the "reasonable volume" requirement.

In contrast to the Hill-Burton Act, Section 501(c)(3) involves no direct contractual relationship, no payment of funds to a specific entity for a specific purpose, no ongoing obligations between the Government and private parties. It creates instead a generalized exemption from taxation applicable to a broad class of persons and organizations, defined as

> [c]orporations, and any community chest, fund, or foundation organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition . . . , or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

Thus, the tax-exempt status may extend not only to hospitals, but to schools, churches, missionary organizations, libraries, research groups, consumer safety organizations, sporting leagues and any number of other causes and concerns. Organizations subject to tax-exempt status have no particular affirmative obligations, but need only fall within the general categories outlined by the statute.

Although Plaintiffs seek to couch their claims in terms of contract, their complaint as it relates to Section 501(c)(3) is essentially a charge that the Medical Center is not entitled to tax-exempt status. Plaintiffs' most pointed contention is that a "non-profit" hospital such as the Medical Center provides no greater degree of care for indigent patients than a for-profit hospital would

provide. Based upon the facts as alleged in the Complaint, Plaintiffs "could have gone to other for-profit hospitals and received the same medical treatment and collections treatment" that they received from the Medical Center.[3]

Notwithstanding any merit that this claim might have, Congress has not established a private right of action allowing a citizen to challenge a tax exemption of a third party. A private right of action to enforce a federal statute exists only where it has been created by Congress. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." Alexander v. Sandoval, 532 U.S. 275, 286 (2001). "[W]here Congress has otherwise enacted 'a comprehensive legislative scheme including an integrated system of procedures for enforcement,' there is a strong presumption that Congress deliberately did not create a private cause of action." Tax Analysts v. Internal Revenue Service, 214 F.3d 179, 186 (D.C. Cir. 2000)(quoting Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985)).

Nowhere among the pages and pages of the Internal Revenue Code is there any indication of an intent to give private parties a right to enforce Section 501(c)(3). Within its comprehensive scheme, the Code generally reserves administration and enforcement of the tax code to the Secretary of the Treasury, "except as otherwise expressly provided by law." See 26 U.S.C. § 7801(a). There is no express provision in Section 501(c)(3) that permits a private citizen to sue a tax-exempt entity for failure to meet the requirements of the statute. The Hill-Burton Act, by contrast, expressly allows private parties, after having pursued a complaint through the Secretary of Health and Human Services, to bring a civil action against an offending facility to effectuate compliance with its

---

[3]See Plaintiffs' Memorandum in Opposition to Motion to Dismiss (Doc. 31), p. 13, n. 14.

obligations to provide indigent care. 42 U.S.C. § 300s-6. The Internal Revenue Code itself includes provisions that expressly allow private actions in certain specific situations.[4] The lack of a similar express provision in Section 501(c)(3) indicates that Congress did not intend to allow private citizens to enforce the provisions of the tax code as it applies to other taxpayers. To the extent that there is an implied private right of action to challenge decisions by the Internal Revenue Service to grant or deny tax exemptions, that right belongs only to the taxpayer who has been denied exempt status. This principle is illustrated by the three cases cited by Plaintiffs, in which courts considered the question of whether a non-profit hospital was exempt from taxation. In each case the parties are the affected taxpayer and the Commissioner of Internal Revenue. See Federation Pharmacy Services, Inc. v. Commissioner, 72 T.Ct. 687 (1979); Geisinger Health Plan v. Commissioner, 985 F.2d 1210 (3rd Cir. 1993); Sonora Community Hosp. v. Commissioner, 46 T.Ct. 519 (1966). These cases support the conclusion that it is the duty of the executive branch, through the IRS, to determine who is entitled to tax exemption, and the right of the affected taxpayer to challenge adverse executive decisions. A third party has no more right to challenge a tax exemption to another party than he has right to bring a private prosecution for tax evasion.

Plaintiffs attempt to maneuver around the lack of a private right of action to enforce Section 501(c)(3) not only by characterizing the tax-exemption as a contract, but also by characterizing it as a trust. In Count Four of the Complaint, Plaintiffs contend that the Medical Center is in breach of an implied charitable trust created as a consequence of its tax exemption. The sole authority cited for this trust proposition is a quotation from an abrogated Revenue Ruling cited in Simon v. Eastern

---

[4]For example, 26 U.S.C. §§ 7431, 7432, and 7433, allow taxpayers to bring suit against the United States for improper disclosure of taxpayer information, failure to release liens on property, and for disregard of the provisions of the code by enforcement officials.

Kentucky Welfare Rights Org., 426 U.S. 26, 29 (1976), which states that "the term 'charitable . . . as it is used in section 501(c)(3) of the Code contemplates an implied public trust constituted for some public benefit." This single statement is a weak foundation for Plaintiffs' claim that an implied charitable trust has arisen under federal law. The ruling from which it is quoted, Revenue Ruling 56-185 was abrogated in 1969 by Revenue Ruling 69-545, which is itself the subject of the litigation in Simon. The use of the word "trust" in the cited quotation has nothing to do with the holding or reasoning of the case. Simon holds that indigent patients who were refused treatment at tax-exempt non-profit hospitals lacked standing to bring suit against Treasury officials challenging the tax exemption. It nowhere holds or even suggests that a tax exemption under Section 501(c)(3) results in an implied charitable trust.

A review of general trust principles shows that the tax exemption granted under Section 501(c)(3) does not create a trust, express or implied, resulting or constructive. Under Georgia law, an express trust must be in writing and must have "each of the following elements, ascertainable with reasonable certainty: (1) An intention by a settlor to create a trust; (2) Trust property; (3) A beneficiary; (4) A trustee; and (5) Active duties imposed on the trustee, which duties may be specified in the writing or implied by law." In re Estate of Chambers, 583 S.E.2d 565, 568 (Ga. App. 2003). There is no written document identified in the pleadings as creating a trust. There is no allegation that either the Medical Center or the Government expressed any intention to create a trust. No trustee is identified, and it is not entirely clear what might allegedly constitute the trust property, whether it would be the entire assets of the Medical Center or merely the tax savings realized as a result of the 501(c)(3) exemption.

9

In their opposition to the Motion to Dismiss, Plaintiffs do not contend that there is an express trust, but rather argue that a trust must be implied. The pleadings, however, do not set forth any basis for finding the existence of an implied trust. An implied trust may be a resulting or constructive trust. O.C.G.A. § 53-12-90. A resulting trust is defined in O.C.G.A. § 53-12-91:

> A resulting trust is a trust implied for the benefit of the settlor or the settlor's successors in interest when it is determined that the settlor did not intend that the holder of the legal title to the trust property also should have the beneficial interest in the property, under any of the following circumstances:
>
> (1) A trust is created but fails, in whole or in part, for any reason;
>
> (2) A trust is fully performed without exhausting all the trust property; or
>
> (3) A purchase money resulting trust as defined in subsection (a) of Code Section 53-12-92 is established.

The facts alleged in this case do not meet the definition of a resulting trust under any of the three categories. Where there is no allegation of any frustrated intent to form a trust on the part of a settlor, there can be no resulting trust.

A constructive trust is defined in O.C.G.A. § 53-12-93 as "a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." Plaintiffs in this case might argue that the Medical Center enjoys the beneficial interest in the tax savings achieved as a result of their 501(c)(3) exemption. It is unclear, however, that its enjoyment of the interest in that money violates any established principle of equity. The Medical Center's entitlement to the tax exemption is a question of tax law, not a question of equity. As discussed above, these Plaintiffs do not have a private right of action to challenge the Treasury Department's approval of the Medical Center's 501(c)(3) application.

10

In addition to their claims related to Section 501(c)(3), Plaintiffs have alleged in Count Six a federal claim for violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. Plaintiffs contend that the requirement to complete the treatment consent form, including the guarantee to pay all charges for such treatment, constituted a delay of treatment in violation of 42 U.S.C. § 1395dd(h). The facts as alleged do not state a claim for which relief can be granted under EMTALA, as Plaintiffs lack standing to bring such claims under the facts as alleged. Plaintiffs do not allege any personal harm as a result of any denial or delay of appropriate medical screening or any transfer prior to stabilization of their medical condition. To the contrary, all Plaintiffs concede that they received full treatment at the Medical Center and do not contend that their treatment was inadequate. They contest, rather, the excessive charges for their treatment, an economic injury.

EMTALA was passed in 1986 to address a perceived problem of hospitals "dumping" indigent patients with emergency medical conditions by refusing to treat them and transferring them to other hospitals while their medical conditions worsened. Harry v. Marchant, 291 F.3d 767, 770 (11th Cir. 2002). The law imposes two principal obligations on hospitals: first, a hospitals must provide every patient, regardless of ability to pay, with an "appropriate medical screening" to determine whether the patient has an emergency medical condition (42 U.S.C. § 1395dd(a)); and second, if the patient has an emergency medical condition, the hospital must provide any treatment necessary to stabilize the patient's medical condition prior to any transfer to another facility (42 U.S.C. § 1395dd(b)).

There is no contention that the Medical Center violated either of these two principal obligations. Plaintiffs received complete treatment for their conditions at the Medical Center and

were never "dumped" or transferred to another facility. The contention instead is that the Medical Center's initial consent to treatment form violated Section 1395dd(h), which states that "a participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) of this section or further medical examination and treatment required under subsection (b) of this section in order to inquire about the individual's method of payment or insurance status." Plaintiffs contend that the consent form amounted to an inquiry into their method of payment or insurance status and that they were essentially coerced by their medical need into signing the guarantee, even though they lacked the ability to pay.

It is unnecessary to consider whether the forms were an improper delay of treatment or were part of a "reasonable registration process,"[5] because Plaintiffs lack standing to bring suit in this case. EMTALA extends a private right of action for damages to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of [EMTALA]." 42 U.S.C. § 1395dd(d)(2)(A). Civil damages are available for "personal injury" as defined under the law of the state in which the hospital is located.  Id.  Under Georgia law, the term "personal injury"refers to "an injury to the physical body of a person, including pain and suffering from such injury, injury to a person's health, or to his reputation, as contradistinguished from injury to his property."  Koon v. Atlantic Coast Line R. Co., 84 S.E.2d 703, 704 (Ga. App. 1954).  Purely economic injury is always contrasted with personal injury.

_____

[5]The regulations at 42 CFR § 489.24(d)(4)(iv) provide that "[h]ospitals may follow reasonable registration processes for individuals for whom examination or treatment is required by this section, including asking whether an individual is insured and, if so, what that insurance is, as long as that inquiry does not delay screening or treatment.  Reasonable registration processes may not unduly discourage individuals from remaining for further evaluation."

In this case, the alleged injury is purely economic. Plaintiffs do not contend that they suffered any injury as a result of denied, delayed, or substandard medical care. They allege instead that the alleged violations of EMTALA "proximately caused . . . economic injury and other damages." Complaint, ¶ 115. In their response to the Motion to Dismiss, Plaintiffs further complain that based upon the payment guarantees they "have incurred grossly inflated medical debt and undergone subsequent collection efforts, court judgments, and liens." Doc. 31, p. 25. These are not the sort of matters that EMTALA was enacted to address. In the Complaint, Plaintiffs claim that the required form contract in essence conditions screening and treatment on a patient's ability to pay. This claim suggests that some indigent patients might have been deterred by the form, or that a patient who refused to sign the form because of his inability to pay might have been refused treatment and suffered injury as a result. These hypothetical patients might have standing to bring suit. The actual Plaintiffs, having received full treatment and having experienced no personal injury, do not.

Plaintiffs' Count Seven, alleging unjust enrichment, also fails to state a cause of action upon which relief can be granted. In their Complaint, Plaintiffs allege that the Medical Center "failed to provide mutually affordable medical care to the Plaintiffs and the Class despite receiving millions of dollars in federal, state, and local tax exemptions for such purpose." The Complaint further charges that the Medical Center has also "realized profits in the millions of dollars by charging the Plaintiffs and the Class the highest and full undiscounted cost for medical care and by charging the Plaintiffs and the Class a higher amount for medical care than their insured patients." Amended Complaint, ¶ 117. As a result, the Complaint alleges, the Medical Center is "in possession of tax

savings, profits, and other assets that they in good conscience and equity should not be entitled to retain." Id., at ¶ 119.

As stated in the Complaint, the claim for unjust enrichment fails for lack of standing. "Unjust enrichment is an equitable concept and 'applies when as a matter of fact there is no legal contract . . . , but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for.'" St. Paul Mercury Ins. Co. v. Meeks, 508 S.E.2d 646, 648 (Ga. 1998). Where a party has been unjustly enriched by a benefit conferred by another party, the party conferring that benefit is the party with standing to sue. As alleged in the Complaint, any unjust benefit was conferred by the treasuries of the United States and the State of Georgia, not by Plaintiffs.

In Count Eleven of the Complaint, Plaintiffs allege that the Medical Center violated the Fair Debt Collection Practices Act ("FDCPA") by its aggressive collection tactics. Count Eleven fails to state a claim because the Medical Center is not a "debt collector" as defined by the statute at 15 U.S.C. § 1692a(6). A debt collector subject to the provisions of the FDCPA is defined as a person "in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." The Complaint does not allege that the principal purpose of the Medical Center's business is the collection of debts, nor does it suggest that the Medical Center regularly attempts to collect debts owed to others. Without dispute, the debts at issue are debts owed to the Medical Center itself, not to another party. Although the statute also extends coverage to "any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts," there is no allegation in the Complaint or

14

elsewhere that the Medical Center used another name or represented itself as a separate debt collection agency in its attempts to collect on Plaintiffs' bills. Because the Medical Center does not meet the definition of a "debt collector," its collection efforts are not regulated by the FDCPA, and Count Eleven must be dismissed.

In Count Twelve of the Complaint, Plaintiffs allege violations of federal constitutional rights under 42 U.S.C. § 1983. This Count fails to state a claim under Section 1983, because any actions by the Medical Center were not undertaken under color of state law. "Section 1983 provides a private right of action whenever an individual has been deprived of any constitutional or statutory federal right under color of state law." Schwier v. Cox, 340 F.3d 1284, 1290 (11th Cir. 2003). "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir.1992). A private party may be held liable as a state actor only if one of the following three conditions is met:

> (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ('State compulsion test'); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ('public function test'); or (3) 'the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[]' ('nexus/joint action test').

Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001) (quoting NBC, Inc. v. Communications Workers of America, 860 F.2d 1022, 1026-27 (11th Cir. 1988)). Plaintiffs' Complaint fails to state a claim under any of the three tests. As to the state compulsion test, Plaintiffs do not contend that the Medical Center's billing practices for uninsured patients were compelled by the Government, only that the Medical Center based its policy upon "perceived requirements" of federal and state laws such as Medicare and Medicaid. Plaintiffs cite no specific provision of any law that mandates the

Medical Center's alleged policy of charging disparate rates for uninsured patients, nor do they allege any Government practice, policy, or command that resulted in those rates. As to the public function test, the Medical Center is not performing a function that is traditionally the *exclusive* province of the Government. Traditionally, in the United States the greatest proportion of health care has been provided by for-profit hospitals, private physicians, churches, and charitable organizations, and has been paid for with private funds or through private health insurance.

As to the nexus/joint action test, the regulations and subsidies related to health care are insufficient to create the necessary "symbiotic relationship" to make the Medical Center a state actor. *See* Rayburn, 241 F.3d at 1348. That symbiotic relationship must involve "the specific conduct of which the plaintiff complains." Id. (quoting American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51 (1999)). Courts have repeatedly held that the extensive regulation, subsidies, and tax exemptions "do not transform an otherwise private hospital into a governmental actor." Mendez v. Belton, 739 F.2d 15, 18 (1st Cir. 1984). *See, also* Harvey v. Harvey, 949 F.2d at 1131; Burton v. William Beaumont Hosp., 2004 WL 2790624 (E.D. Mich. 2004). In this case, the specific conduct attributed to the Medical Center arises not from any relationship with the Government, but from its own alleged policies. Because the Complaint does not allege any action committed under color of state law, Plaintiffs cannot maintain an action under Section 1983, and Count Twelve must be dismissed.

Counts Nine and Ten of the Complaint allege that the Medical Center and the AHA conspired with and aided and abetted one another in formulating the billing and collection policies of which Plaintiffs complain in the other Counts of their Complaint. To the extent that the Complaint sets forth claims for conspiracy or aiding and abetting in regard to the various claims under federal law dismissed above, they are also dismissed.

16

The remaining claims, in Counts Two, Three, and Five, set forth matters of purely state law. As there is no diversity of citizenship in this case, the Court has no original subject matter jurisdiction over those claims. Resolution of the claims in Count Two, Three, and Five will require determinations of Georgia law that will be best made by Georgia courts. "[J]udicial economy, fairness, convenience, and comity dictate having these state law claims decided by the state courts." *See* <u>Baggett v. First Nat'l Bank of Gainesville</u>, 117 F.3d 1342, 1353 (11th Cir. 1997). **Accordingly Counts Two, Three, and Five, along with any state law claims set forth in Counts Eight, Nine, and Ten, are dismissed without prejudice. All other claims are dismissed with prejudice**.

**SO ORDERED** this the 21st day of January, 2005.

s/ C. ASHLEY ROYAL
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

CW/jec

17