UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rachel Peterson and Chad Johnson,
On Behalf of Themselves and All
Others Similarly Situated,

              Plaintiffs,

v.

Fairview Health Services,

              Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 04-2973 ADM/AJB

---

Paul Kern and Michael Schemel,
On Behalf of Themselves and All
Others Similarly Situated,

              Plaintiffs

v.

Allina Health System and American
Hospital Association,

              Defendants.

Civil No. 04-2974 ADM/AJB

---

Robert Randall Hopper, Esq., Zimmerman Reed PLLP, Minneapolis, MN, and Richard F. Scruggs, Esq., Scruggs Law Firm, Oxford, MS, appeared for and on behalf of Plaintiffs.

Paul B. Klaas, Esq., Peter W. Sipkins, Esq., Marianne D. Short, Esq., and Rachel K. Paulose, Esq., Dorsey & Whitney LLP, Minneapolis, MN, appeared for and on behalf of Defendants Fairview Health Services and Allina Health System.

Janice Marie Symchych, Esq., Halleland, Lewis, Nilan, Sipkins & Johnson, Minneapolis, MN, appeared for Defendant American Hospital Association.

---

## I. INTRODUCTION

On December 13, 2004, oral argument before the undersigned United States District Judge was heard on Fairview Health Services' ("Fairview") Motion to Dismiss [Docket No. 8]

the Second Amended Class Action Complaint of Rachel Peterson ("Peterson") and Chad Johnson ("Johnson"), on Behalf of Themselves and All Others Similarly Situated ("Peterson Second Am. Compl.") [Docket No. 7]. Simultaneously, oral argument was heard on Allina Health System's ("Allina") Motion to Dismiss [Docket No. 5] the Amended Class Action Complaint of Paul Kern ("Kern") and Michael Schemel ("Schemel"), on Behalf of Themselves and All Others Similarly Situated ("Kern Am. Compl.") [Docket No. 4]. The parties to both cases agree that the issues in each case are identical. As a result, the Court will consider the cases together.[1]

Plaintiffs seek to form a class of all uninsured patients of Defendants who beginning on January 1, 1997 "were charged an amount for medical care in excess of the amount charged to Defendant[s'] Medicare patients, or . . . who were pursued for any charged amount through collection efforts or lawsuits." Kern Am. Compl. ¶ 37; Peterson Second Am. Compl. ¶ 39. The gravamen of Plaintiffs' Complaints is that Defendants are tax-exempt organizations that have failed to meet the charitable obligations imposed by 26 U.S.C. § 501(c)(3). Plaintiffs claim Defendants charge uninsured patients more than insured patients for identical services and then utilize "aggressive, abusive and humiliating" collection practices to recover for the services. Kern Am. Compl. ¶ 6; Peterson Second Am. Compl. ¶ 6. Plaintiffs contend the granting of § 501(c)(3) status forms a contract enforceable by those who are its intended beneficiaries, namely, uninsured patients.

---

[1] Unless otherwise noted, the Court will use "Plaintiffs" to collectively refer to Peterson, Johnson, Kern and Schemel and "Defendants" to collectively refer to Allina and Fairview.

2

On this premise, Plaintiffs assert a number of claims against Defendants, including: (1) breach of contract; (2) breach of duty of good faith and fair dealing; (3) violation of Minnesota Consumer Fraud and Deceptive Trade Practices Act; (4) breach of implied public trust; (5) unjust enrichment/constructive trust. Plaintiffs also assert violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. Additionally, Kern and Schemel allege the American Hospital Association ("AHA") (1) entered into a civil conspiracy with Allina to breach Allina's contracts with the United States Government and the State of Minnesota, and (2) aided and abetted Allina in breaching these tax-exempt contracts. There is no claim asserted in either suit regarding the adequacy of the care provided by Defendants to Plaintiffs.

Pursuant to Rule 12(b)(1) and 12(b)(6), Defendants move to dismiss Plaintiffs' Complaints for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. For the reasons set forth below, both Allina and Fairview's Motions are granted.

## II. BACKGROUND[2]

Fairview is a Minneapolis-based, nonprofit health care organization that owns and operates several hospitals and other health care facilities. Peterson Second Am. Compl. ¶¶ 1, 10, 13-14. Fairview previously owned a clinic known as the Fairview Westridge Clinic. Id. ¶ 14. Pursuant to § 501(c)(3) and Minn. Stat. § 290.05 subd. 2, respectively, Fairview is tax-exempt from both federal and state income tax. Id. ¶ 16.

---

[2] For purposes of the instant Motion, the facts are viewed in the light most favorable to the nonmoving party. See Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

In 2001, Peterson, a resident of Minneapolis, Minnesota, was a patient of Fairview Westridge Clinic. Id. ¶¶ 8, 28. At that time, Peterson was uninsured, unemployed and not covered by any governmental health care plan. Id. ¶ 29. After treating Peterson, Fairview billed her the full, undiscounted cost for services rendered. Id. ¶ 30. Peterson consulted a credit counseling service and has made, and continues to make, payments on the outstanding balance for services rendered. Id. ¶¶ 31-32.

On February 16, 2004, Johnson, a Minnesota resident, presented to Fairview Riverside Hospital's emergency room for treatment of a dog bite. Id. ¶¶ 9, 33. Johnson was required to sign a document, entitled "Patient Waiver," stating he was self-insured and was "financially liable for the services being provided." Id. ¶ 34. He was also given the opportunity to decline treatment and avoid charges for services to be rendered. Id. ¶ 35. Johnson was not offered or provided no-cost or reduced cost health care. Id. ¶ 36. Johnson claims he could not afford the costs of the services provided and has not made payments for services rendered, although he has continued to be billed. Id. ¶¶ 37-38.

Allina is a Minneapolis-based, nonprofit health care organization that owns and operates several hospitals. Kern Am. Compl. ¶¶ 1, 10, 14-15. Pursuant to § 501(c)(3) and Minn. Stat. § 290.05 subd. 2, respectively, Allina is tax-exempt from both federal and state income tax. Id. ¶ 17. Allina is a member of the AHA, a corporation with its principal place of business in Chicago, Illinois, that serves as the national trade association for the nonprofit hospital association. Id. ¶ 11.

In July 2002, Kern, a resident of Minnesota, was a patient at Allina's United Hospital in St. Paul, Minnesota. Id. ¶¶ 8, 29. At that time, Kern was uninsured and not participating in any

governmental plan covering his health care costs. Id. ¶ 30. Kern was sporadically employed but, due to his minimal income, received an earned income tax refund from the government upon the filing of his tax return. Id. Because he was uninsured, Kern believed he would not be charged for the care provided by Allina. Id. ¶ 31. Allina billed Kern for the full, undiscounted cost for services rendered. Id. After being contacted several times by Allina's internal collection process, Kern consulted a consumer credit counseling service, but Allina refused to reduce its interest rate or payment requirement on the outstanding bill. Id. ¶¶ 31-32. Kern has made, and continues to make, payments on the outstanding balance for services rendered. Id. ¶ 33.

In November 2003 and June 2004, Schemel, a resident of Minnesota, was a patient at Allina's United Hospital in St. Paul, Minnesota. Id. ¶¶ 9, 34-35. On both occasions, Schemel presented to the emergency room and indicated he had no health insurance coverage. Id. ¶ 36. At both times he had minimal income. Id. Schemel was not offered and did not receive no-cost or reduced cost health care during either admission. Id. Schemel has not made any payments on the outstanding balance for services rendered and has been the subject of collection efforts by Allina. Id.

This suit is one of dozens filed across the country, alleging, inter alia, that nonprofit hospitals are violating contractual obligations imposed by § 501(c)(3). Upon motions by several claimants, the Judicial Panel on Multidistrict Litigation considered and rejected a request to transfer and consolidate the pending actions to a single district court pursuant to 28 U.S.C. § 1407. In re Not-For-Profit Hospitals/Uninsured Patients Litigation, 341 F. Supp. 2d 1354, 1355-56 (J.P.M.L. Oct. 19, 2004). While several district courts have yet to rule on similar

5

actions, no court that has considered the matter has ruled in Plaintiffs' favor on any substantive legal issue.[3]

## III. DISCUSSION

### A. Standard of Review

In considering a motion to dismiss under Rules 12(b)(1) and 12(b)(6), courts must construe the pleadings in the light most favorable to the nonmoving party and view the facts alleged in the complaint as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. Ossman, 825 F. Supp. at 880. "A motion to dismiss should be granted as a practical matter . . . only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

### B. Count I: Breach of Contract

#### 1. Existence of a Contract

The Plaintiffs' case attempts to build on a flawed foundation. The foundation or premise from which the claims rise is that a contractual relationship is created between the government and the hospitals by the grant of tax-exempt status under § 501(c)(3). Plaintiffs' allege the

---

[3] See Washington v. Medical Ctr. of Central Georgia, C.A. No. 5:04-185 (M.D. Ga. Jan. 21, 2005); Shriner v. ProMedica Health System, Inc., 2005 U.S. Dist. LEXIS 894 (N.D. Ohio Jan. 21, 2005); Hudson v. Central Georgia Health Services, C.A. No. 5:04-301 (M.D. Ga. Jan. 13, 2005); Lorens v. Catholic Health Care Partners, C.A. No. 1:04-1151 (E.D. Ohio Jan. 13, 2005); Ferguson v. Centura Health Corp., C.A. No. 04-1285 (D. Co. Dec. 29, 2004); Burton v. William Beaumont Hosp., 2004 WL 2790624 (E.D. Mich. Dec. 3, 2004); Darr v. Sutter Health, 2004 WL 2873068 (N.D. Ca. Nov. 30, 2004); Amato v. UPMC, No. 04-1025 (W.D. Pa. Nov. 23, 2004).

6

consideration for the favored tax status is an obligation by the hospitals to provide charitable care to individuals without health insurance who are unable to pay for hospital services. Further, Plaintiffs allege the hospitals have a contractual duty to refrain from collection efforts to recover for the cost of those services from these individuals.

There is no legal support to bolster Plaintiffs' theory of liability. No court has ever held that awarding § 501(c)(3) status establishes a contractual relationship between the government and the tax-exempt entity. See n. 3, supra. In fact, "[t]he notion that the federal income tax is contractual or otherwise consensual in nature . . . has been repeatedly rejected by the courts." McLaughlin v. Commissioner, 823 F.2d 986, 987 (7th Cir. 1987) (citations omitted); see also Merrick v. United States, 846 F.2d 725, 726 (Fed. Cir. 1988). The United States Supreme Court has stated:

> [A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state.

Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66 (1985) (citations omitted). Section 501(c)(3) contains a list of the types of organizations that may qualify for tax-exempt status but has no contract-creating language. As a result, the presumption is that § 501(c)(3) does not create a contract.

Plaintiffs seek to overcome this presumption by analogizing § 501(c)(3) to the Hill-Burton Act, 42 U.S.C. § 291. Hill-Burton granted federal funds to states to assist state programs for the construction and modernization of hospitals and other medical facilities. Under the program, a hospital applying for federal funds must, inter alia, agree to provide "a reasonable

7

volume of services to persons unable to pay therefor . . . ." Id. § 291c(e)(2). Courts have held that hospitals that accepted Hill-Burton funds are contractually obligated under § 291c(e)(2) to provide charity care to indigent and uninsured patients and that third party beneficiaries of those contracts could sue to enforce those obligations. See, e.g., Flagstaff Medical Center v. Sullivan, 962 F.2d 879 (9th Cir. 1992); Saine v. Hospital Authority of Hall County, 502 F.2d 1033 (5th Cir. 1974).

  Plaintiffs' attempt to analogize § 501(c)(3) to Hill-Burton to establish that tax-exempt status creates a contract between the federal government and a hospital is rejected. Hill-Burton authorizes direct grants of funds to hospitals for specific purposes while § 501(c)(3) is a provision within the comprehensive statutory structure of the Internal Revenue Code that provides tax exemptions. These tax exemptions are not limited to hospitals but may be granted to any nonprofit organized for one of many designated purposes. Hill-Burton also requires applicants to sign a "Memorandum of Agreement" expressly conditioning the grant of federal monies on the hospital's promise to provide "a reasonable volume of services to persons unable to pay therefor." See Euresti v. Stenner, 458 F.2d 1115, 1118-19 (10th Cir. 1992). Significantly, § 501(c)(3) contains no such language and the Internal Revenue Service ("IRS") does not require organizations to enter into any express contractual agreement before receiving tax-exempt status. Finally, Hill-Burton includes a private cause of action to enforce the Act. See 4 U.S.C. § 300s-6. As discussed below, § 501(c)(3) does not provide for a private cause of action. It merely has a provision permitting the IRS or the organization seeking non-profit status to challenge a determination of IRS eligibility. As these differences demonstrate, § 501(c)(3) is not analogous to Hill-Burton and does not create a contract between the federal government and an

organization with a tax-exempt designation. Therefore any claims that rely on § 501(c)(3) creating a contractual relationship between Defendants and the federal government must be dismissed for failure to state a claim upon which relief can be granted.

### 2.    Cause of Action

Even if § 501(c)(3) did create an enforceable contract, Plaintiffs would still lack standing to enforce those obligations because § 501(c)(3) does not contain a private cause of action. Because the parties to the purported contract are the government and the tax-exempt organization, rather than the recipients of the services, Plaintiffs would have to demonstrate third-party beneficiary rights to establish standing.

Standing is an "irreducible constitutional minimum" that is "an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "If a plaintiff lacks standing, the district court has no subject matter jurisdiction." Faibisch v. Univ. of Minnesota, 304 F.3d 797 (8th Cir. 2002).

#### a.    Private Cause of Action

Defendants argue that Plaintiffs lack standing because there is no private cause of action under § 501(c)(3). It is well-established that private plaintiffs do not have standing to sue under federal statutes unless they have been granted that right by Congress. See Allen v. Wright, 468 U.S. 737, 753 (1984) (finding private plaintiffs lacked standing to challenge the non-profit tax status of allegedly discriminatory schools). Courts must "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." Alexander v. Sandoval, 532 U.S. 275, 287 (2001). Without statutory intent, "a

9

cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Id.

Section 501(c)(3) does not explicitly grant the general public or uninsured patients a private cause of action. Section 501(c)(3) does permit the IRS to challenge whether an organization should continue to receive tax-exempt status and an organization may contest IRS denial of a tax exemption.

Section 501(c)(3) has no language which implies a private cause of action. As 26 U.S.C. § 7801 states, "[e]xcept as otherwise expressly provided by law, the administration and enforcement of [the tax code] shall be performed by or under the supervision of the Secretary of Treasury." Despite other provisions of the Internal Revenue Code specifically authorizing actions by third parties affected by tax collection activities or IRS proceedings, no section of the tax code authorizes private enforcement actions under § 501(c)(3). See, e.g., 26 U.S.C. § 7426.

Furthermore, the text of § 501(c)(3) and Treas. Reg. § 1.501(c)(3)-1 focuses on the activities of entities seeking tax exemptions and is devoid of "explicit rights-creating terms." Gonzaga Univ. v. Doe, 536 U.S. 272, 283-84 (2002). This language is directed to organizations that may receive tax-exempt status rather than identifying a particular class of person who may benefit from these organizations. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" Sandoval, 532 U.S. at 289 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)). As evidenced by Hill-Burton, Congress knew how to include an implied cause of action when it so desired. No similar intent is found in § 501(c)(3).

10

### b. Third-Party Beneficiaries

Setting aside legislative history and intent, Plaintiffs argue they may sue as third-party beneficiaries to the contract created by § 501(c)(3). Assuming for the moment that § 501(c)(3) establishes a contract between hospitals and the federal government, an argument previously rejected, there is no evidence that Plaintiffs are the intended beneficiaries of such a contract.

Traditional principles of contract interpretation and construction determine one's status as a third-party beneficiary. See United Steel Workers of Am., AFL-CIO-CLC v. Rawson, 495 U.S. 362, 375 (1990); Pure Country, Inc. v. Sigma Chi Fraternity, 312 F.3d 952, 958 (8th Cir. 2002). Although a third-party beneficiary does not need to be expressly named in the contract, the contracting parties must express some explicit intent to benefit a third party. See Mille Lacs Band of Chippewa Indians v. Minnesota, 853 F. Supp. 1118, 1145 (D. Minn. 1994), aff'd 124 F.3d 904 (8th Cir. 1997), aff'd 526 U.S. 172 (1999); Roedler v. United States Dept. of Energy, 1999 WL 1627346, at *8 (D. Minn. Dec. 23, 1999). Mere economic consequences to a third-party in event a contract is breached are not themselves sufficient to establish the affected party as a third-party beneficiary. Hibbs v. K-Mart Corp., 870 F.2d 435, 441 (8th Cir. 1989).

Plaintiffs rely heavily on Montana v. United States for the proposition that "[t]he intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class intended to be benefitted thereby." 124 F.3d 1269, 1273 (Fed Cir. 1997). However, the court's holding applied to Montana, a state, and not to members of the general public. The court explained, "when members of the public bring suit against promisors who contract with the government to render a public service . . . [they] are considered to be incidental beneficiaries unless they can show a direct right to compensation." Id. at n. 6. See also Roedler,

11

1999 WL 1627346, at *7 (plaintiffs required to show parties "intended to give the third party an enforceable right to sue for compensation . . . in cases in which members of the public bring suit against promisors who contract with the government to render a public service").

Plaintiffs are unable to cite any provision of § 501(c)(3) or the tax code which states or implies that the uninsured have a direct right to compensation under the statute or to support Plaintiffs' statement that "uninsured and indigent patients of hospitals . . . were intended to benefit from the hospital's tax-exempt status." Pls.' Reply to Def.'s Mot. to Dismiss the Am. Compl. [Docket No. 32, Civil Case No. 04-2974] at 16; Pls.' Reply to Def.'s Mot. to Dismiss the Second Am. Compl. [Docket No. 38, Civil Case No. 04-2973] at 16. Section 501(c)(3) does not explicitly define a nonprofit hospital's "charitable" obligations. Furthermore, there is no bright line test for determining whether a nonprofit hospital is entitled to tax-exempt status. See Geisinger Health Plan v. Commissioner, 985 F.2d 1210, 1217 (3d Cir. 1993). Section 501(c)(3) authorizes the IRS to grant tax-exempt status to nonprofit organizations engaged in one of several listed purposes.

Because § 501(c)(3) does not establish a contract between the federal government and Defendants and does not provide Plaintiffs with an implied cause of action or a right to sue as third-party beneficiaries, Count I, insofar as it is premised on § 501(c)(3), must be dismissed with prejudice for lack of standing and for failure to state a claim upon which relief can be granted.

12

C.   **Count II: Breach of Duty of Good Faith and Fair Dealing**

Plaintiffs assert Defendants entered into express and/or implied contractual relationships with the United States government and the State of Minnesota to provide mutually affordable health care to the uninsured in return for substantial federal and state tax exemptions. Kern Am. Compl. ¶¶ 60-61; Peterson Second Am. Compl. ¶¶ 62-63. Alternatively, they argue Defendants entered into an express and/or implied contractual relationship with the uninsured to admit them for the purpose of receiving adequate, mutually affordable medical care. Kern Am. Compl. ¶ 69; Peterson Second Am. Compl. ¶ 71. A duty of good faith and fair dealing only exists where the parties are bound by a contractual relationship. See Miller v. ACE USA, 261 F. Supp. 2d 1130, 1140 (D. Minn. 2003); Parkhill v. Minn. Mut. Life Ins. Co., 174 F. Supp. 2d 951, 960 (D. Minn. 2000); aff'd 286 F.3d 1051 (8th Cir. 2002). Plaintiffs aver Defendants' conduct constitutes breach of that duty of good faith and fair dealing.

For the same reasons Count I fails, Count II must be dismissed with prejudice to the extent it relies on § 501(c)(3). Because § 501(c)(3) does not create a contract between nonprofit entities and the federal government, Defendants could not have breached any duty of good faith and fair dealing.

D.   **Count IV: Breach of Implied Public Trust**

Plaintiffs argue that by accepting § 501(c)(3) status, Defendants have entered into an implied public trust "whereby it is to provide public benefits through the use of all excess revenues for the benefit of the community and meet the totality of its obligations to the community as a nonprofit tax-exempt entity." Kern Am. Compl. ¶ 69; Peterson Second Am. Compl. ¶ 71. Plaintiffs rely on Simon v. E. Ky. Welfare Rights Org., in which the Supreme

13

Court stated that Revenue Ruling 56-185 "established the position of the IRS to be 'that the term 'charitable' in its legal sense and as it is used in section 501(c)(3) of the Code contemplates an implied public trust constituted for some benefit.'" 426 U.S. 26, 29 (1976). However, the Supreme Court also recognized that Revenue Ruling 56-185 was superseded by Revenue Ruling 69-545, which deleted the implied charitable trust language from the definition of a § 501(c)(3) corporation. See id. at 30, 46 (finding Plaintiffs lacked standing to challenge Revenue Ruling 69-545).

Furthermore, charitable trusts require specific language demonstrating intent to create a trust. Section 501(c)(3) contains no such language. Assuming, arguendo, § 501(c)(3) did establish a trust, Plaintiffs lack standing to sue for breach of such a charitable trust. Members of the public do not have standing to sue on the trust merely because they benefit from the trust. Rest.2d Trusts § 391. "As a general rule, no public citizen can sue to enforce a charitable trust merely on the ground that he believes he is within the class to be benefited by the trust." Bogert, Bogert's Trusts & Trustees § 414 at 39. As a result, Count IV is dismissed with prejudice insofar as it states a claim based on § 501(c)(3) or other federal law.

E.     **Count V: Unjust Enrichment/Constructive Trust**

Plaintiffs assert Defendants have been unjustly enriched because they have received tax exemptions without meeting § 501(c)(3)'s requirement of providing mutually affordable medical care to the uninsured. They argue they are entitled to a constructive trust on all profits the Defendants obtained for charging uninsured patients the highest and full undiscounted cost of medical care, the difference in the amount charged uninsured patients and insured patients for the same care, and an amount of Defendants' net assets sufficient to provide uninsured patients

future, mutually affordable health care. Kern Am. Compl. ¶ 77; Peterson Second Am. Compl. ¶ 79.

Claims for unjust enrichment and imposition of a constructive trust are creatures of equity that exist in the absence of a contract. See Northwest Airlines, Inc. v. Astraea Aviation Servs., 111 F.3d 1386, 1392 n.4 (8th Cir, 1997); Ringier Inc. v. Land O'Lakes, Inc., 106 F.3d 825, 829 (8th Cir. 1997); Ferris, Baker, Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.), 286 B.R. 109, 124-25 (Bankr. D. Minn. 2002), aff'd 2003 U.S. Dist. LEXIS 5954 (D. Minn. 2003), aff'd 371 F.3d 397 (8th Cir. 2004).

The conclusion that § 501(c)(3) imposes no requirement that hospitals provide mutually affordable medical care to the uninsured also spells the demise of this claim. Further, the unjust enrichment claim amounts to a collateral attack on the IRS's decision to grant Defendants tax-exempt status. As the Court has already noted, it is the Secretary of the Treasury's responsibility to oversee the tax code and only the IRS can contest whether a nonprofit organization should retain tax-exempt status. See 26 U.S.C. § 7801; § 501(c)(3). The IRS granted Defendants' § 501(c)(3) status and an unjust enrichment claim can not lie when benefits have been knowingly conferred. See Ringier Inc., 106 F.3d at 829; Northwest Equip. Fin. v. Nath. (In re D&P P'ship), 91 F.3d 1072, 1075 (8th Cir. 1996). Furthermore, even assuming Defendants were unjustly enriched by failing to meet their § 501(c)(3) obligations, Plaintiffs lack standing to assert an unjust enrichment claim. Finally, a constructive trust may not be imposed without a showing that Defendants obtained property by fraud, bad faith, duress, undue influence or other improper means. See MLK Clearing, 286 B.R. at 126. Plaintiffs acknowledge they received appropriate medical treatment from Defendants and there is no evidence of bad faith proffered.

15

For the aforementioned reasons, Count V must be dismissed.

F. **Count VI: Emergency Medical Treatment and Active Labor Act ("EMTALA")**

When Plaintiff Johnson presented to Defendant Fairview's emergency room with a dog bite, he was required to sign a "Patient Waiver" acknowledging he was self-insured and would be financially liable for any care received as a condition of treatment. Peterson Second Am. Compl. ¶¶ 33-35, 81. Plaintiff Schemel twice presented to Allina's emergency room. Kern Am. Compl. ¶¶ 34-35. Although he told Allina representatives that he was uninsured, he does not describe being required to sign a similar "Patient Waiver." Kern Am. Compl. ¶ 36. Plaintiff Kern never claims to have presented to the emergency room for treatment. Nevertheless, Plaintiffs Johnson, Schemel and Kern assert that Defendants required they sign such form contracts before admitting them to the emergency room for medical care. Kern Am. Compl. ¶ 79; Peterson Second Am. Compl. ¶ 81. Conditioning medical treatment for "emergency medical conditions" on such financial guarantees allegedly violates the EMTALA requirement that emergency room medical care be provided without regard to the patient's ability to pay. Kern Am. Compl. ¶ 79; Peterson Second Am. Compl. ¶ 81. Although Plaintiffs do not allege this violation resulted in any physical harm or inadequate treatment, they claim the practice caused them "economic injury and other damages." Kern Am. Compl. ¶ 80; Peterson Second Am. Compl. ¶ 82.

EMTALA requires hospitals that participate in the federal Medicare program to: (1) conduct a screening on every patient that presents to the emergency room to determine if the patient is suffering from an emergency medical condition; and (2) in the event such a condition exists, stabilize the patient before he or she may be transferred or discharged. 42 U.S.C.

§§ 1395dd(a), (b), (c) and (e). A participating hospital may not delay the provision of appropriate medical screening or medical examination and treatment in order to inquire about the patient's method of payment or insurance status. Id. § 1395dd(h). Although EMTALA contains several provisions for enforcement of the Act, only § 1395dd(d)(2)(A) provides for civil enforcement by patients:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

Defendants argue Plaintiffs' EMTALA claims should be dismissed because they have failed to allege they suffered any personal harm as a result of signing the "Patient Waivers." Again, Plaintiffs do not challenge the medical adequacy of their care. Plaintiffs claim that economic injuries constitute personal harm as contemplated by § 1395dd(d)(2)(A). In support, they cite to EMTALA provisions permitting hospitals and whistleblowers to recover for economic injuries resulting from patient dumping and retaliation, respectively. §§ 1395dd(d)(2)(B) and (i).

Plaintiffs' arguments are not persuasive. Under Minnesota law, the plain meaning of personal harm does not include economic injury. See State of Minnesota v. Bradley Charles Wilking, 2002 Minn. App. LEXIS 1218; *7-8 (Minn. Ct. App. Oct. 22, 2002). Furthermore, Plaintiffs' citations to other EMTALA provisions permitting whistleblowers and hospitals to recover for economic injury are inapposite to determining whether § 1395dd(d)(2)(A) permits recovery for economic injury.

Plaintiffs' Complaints are facially deficient in that they fail to assert the personal harm necessary to support an EMTALA claim under § 1395dd(d)(2)(A). As a result, Count VI will be

dismissed. Should Plaintiffs garner additional facts sufficient to support an EMTALA claim, such as indications that the delay in treatment exacerbated their injury or resulted in physical harm, they may refile their Complaints.

### G. Counts VII and VIII: Civil Conspiracy and Aiding and Abetting

Kern and Schemel allege Allina and the AHA entered into a civil conspiracy to breach Allina's tax-exempt contracts with the United States government and the State of Minnesota. Kern Am. Compl. ¶¶ 81-84. They further allege the AHA aided and abetted Allina in breaching those contracts "by providing substantial advisory assistance and guidance . . . on how to bill its uninsured patients the full undiscounted cost of medical care and how to collect" such debt from uninsured patients. Id. ¶¶ 85-88.

As this Court rejected the premise of a contractual obligation, Allina and the AHA could not have entered into a conspiracy to breach a contract, and the AHA could not have aided and abetted Allina in avoiding the non-existent obligations. Insofar as these claims depend on § 501(c)(3), they must be dismissed with regard to Allina for failure to state a claim upon which relief can be granted. As the AHA is not a party to the instant Motion, these claims survive against that organization.

### H. State Law Claims

Having dismissed Plaintiffs' federal claims, the remaining claims, in Counts I, II, III, IV and V, set forth matters of state law. Kern and Schemel also allege additional state law claims against Allina in Counts VII and VIII As there is no diversity of citizenship in this case, this Court has no original subject matter jurisdiction over these claims. According to the Supreme Court, "if federal claims are dismissed before trial, even though not insubstantial in a

18

jurisdictional sense, the state claims should be dismissed as well." <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1966). The state courts of Minnesota, rather than federal courts, should rule on issues of Minnesota law. As a result, this Court declines to exercise its supplemental jurisdiction and dismisses the aforementioned, remaining state law claims without prejudice.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Fairview Health Services' Motion to Dismiss [Docket No. 8, Civil Case No. 04-2973] is **GRANTED**;

2. The Second Amended Complaint of Rachel Peterson and Chad Johnson, on Behalf of Themselves and All Others Similarly Situated [Docket No. 7, Civil Case No. 04-2973], is **DISMISSED WITH PREJUDICE** to the extent Counts I, II, IV, and V rely on federal law or 26 U.S.C. § 501(c)(3) and **DISMISSED WITHOUT PREJUDICE** to the extent Counts I, II, III, IV, V and VI rely on state law or EMTALA.

3. Allina Health System's Motion to Dismiss [Docket No. 5, Civil Case No. 04-2974] is **GRANTED**; and

4. The Amended Class Action Complaint of Paul Kern and Michael Schemel's, on Behalf of Themselves and All Others Similarly Situated [Docket No. 4, Civil Case No. 04-2974], is **DISMISSED WITH PREJUDICE** to the extent Counts I, II, IV, and V, VII and VIII rely on federal law or 26 U.S.C. § 501(c)(3) and **DISMISSED WITHOUT PREJUDICE** to the extent Counts I, II, III, IV, V and VI rely on state law or EMTALA.

**LET JUDGEMENT BE ENTERED ACCORDINGLY** on Civil Case No. 04-2973.

BY THE COURT:

_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: February 1, 2005.